**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220398-U

Order filed March 3, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* MARRIAGE OF ALEXANDER TURNER, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | Appeal No. 3-22-0398 Circuit No. 21-D-254 |
| | ) | |
| LYNDSEY TURNER, | ) ) | The Honorable Kenton J. Skarin, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Albrecht and Brennan concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) Appellate court lacked jurisdiction to consider propriety of trial court order denying father's request for temporary parenting schedule where father did not identify order in notice of appeal; (2) trial court's admission of court-appointed expert's report did not prejudice father where court disregarded expert's opinions; (3) trial court did not err in allowing mother to elicit opinions from father's expert on cross-examination; (4) trial court granting mother primary decision-making authority was not against manifest weight of evidence where many disagreements had arisen between parties and father disregarded mother's opinions; and (5) trial court granting majority of parenting time to mother was not against the manifest weight of evidence where trial court determined mother was more likely than father to place needs of children ahead of her own.

¶ 2       In February 2021, petitioner Alexander (Alex) Turner filed a petition for dissolution of marriage, and respondent Lyndsey Turner filed a counter-petition for dissolution of marriage. The parties have two children together, one born in 2015 and one born in 2018. Following a four-day trial, the court entered a parenting allocation plan and order granting Lyndsey primary decision-making authority over the children and the majority of parenting time, particularly during the school year. Alex appeals, arguing (1) the trial court denied his constitutional rights, as well as Illinois law and rules, when it denied him a hearing on his May 2021 petition for a temporary parenting schedule, (2) the trial court erred in allowing certain evidence and testimony to be admitted at trial, and (3) the trial court erred in its allocations of decision-making and parenting time. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4       The parties, Alex and Lyndsey, were married in 2015. They had two children together: N.T., born in 2015, and D.T., born in 2018. On February 9, 2021, Alex filed a petition for dissolution of marriage. On February 19, 2021, Lyndsey filed a counter-petition for dissolution of marriage.

¶ 5       In March 2021, the trial court appointed a guardian *ad litem* (GAL), Chuck Roberts. In July 2021, Roberts filed a motion requesting a parenting evaluation. Shortly thereafter, the court appointed Dr. Roger Hatcher to conduct a parenting evaluation pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2020)). In May 2021, Alex filed a petition to set a temporary parenting schedule. In July 2021, the trial court denied Alex's request for a hearing on his petition. In August 2021, the trial court entered an agreed order granting Alex parenting time with the children on alternating Monday evenings, every Wednesday evening, and alternating weekends from Friday to Sunday.

¶ 6    In October 2021, Dr. Hatcher tendered his report to the court. In his report, Dr. Hatcher diagnosed Alex as suffering from narcissistic personality disorder and recommended that Lyndsey have sole decision-making responsibilities for the children and the majority of parenting time with the children. In April 2022, Alex filed a motion *in limine* seeking to bar Dr. Hatcher's report. The trial court denied that motion. In May 2022, the trial court entered an agreed order regarding summer parenting time, which provided each party parenting time with the children for alternating weeks during the summer.

¶ 7    Prior to trial, Alex disclosed Dr. Robert Shapiro as his controlled expert witness, pursuant to Illinois Supreme Court Rule 213(f)(3) (Ill. S. Ct. Rule 213(f)(3) (eff. Jan. 1, 2018)). Less than a week before trial, Alex filed a second motion *in limine*, seeking to (1) again bar Dr. Hatcher's report, (2) bar Lyndsey from calling Dr. Shapiro to testify on her behalf, and (3) limit Dr. Shapiro's testimony to the opinions contained in his report. The trial court denied the motion.

¶ 8    Trial was held July 25-28, 2022. At trial, GAL Roberts recommended that Lyndsey have primary decision-making authority over the children and the majority of parenting time with the children. He recommended that Alex have parenting time during the school year on alternating weekends from Friday to Monday, every Wednesday evening, and alternating Monday evenings. Roberts did not believe it was in the children's best interests to have weekday overnight visitation with Alex during the school year. For summers, Roberts recommended the parties alternate parenting time with the children on a weekly basis so the children would spend one week with one parent followed by a week with the other parent.

¶ 9    Roberts testified that the best interests factors in section 602.5 of the Act (750 ILCS 5/602.5(c) (West 2020)) favored Lyndsey having primary decision-making authority over the children, and the best interests factors in section 602.7 of the Act (750 ILCS 5/602.7(b) (West

2020)) favored Lyndsey having the majority of parenting time with the children. Roberts found Alex to be not credible because "[h]is description of his wife was perfectly inconsistent with what I ultimately determined to be the case." In June 2021, Alex and his attorneys told Roberts that Lyndsey's home was a "shambles" and "presented a dangerous condition for the children." As a result, Roberts immediately made a surprise visit to Lyndsey's home "[t]otally unannounced" and found nothing concerning. Alex's mental health contributed to Roberts's recommendation that Lyndsey have primary decision-making authority over the children.

¶ 10        Dr. Roger Hatcher testified he was appointed by the court, pursuant to section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2020)), to examine parenting issues in this case. He testified he has been a court-appointed evaluator in custody cases "over a thousand times." Dr. Hatcher administered the Minnesota Multiphasic Personality Inventory, Second Edition (MMPIA-2) and the Millon Clinical Multiaccess Inventory, Third Edition (MCMI) to Alex. As a result of those tests, as well as Dr. Hatcher's observations of Alex and Alex's statements to Dr. Hatcher "about himself and the world around him," Dr. Hatcher determined that Alex "met the diagnostic criteria for narcissistic personality disorder." Dr. Hatcher testified that Alex's narcissism score was the highest he had ever seen on the MCMI. Dr. Hatcher admitted that Alex's treating psychiatrist, Dr. Wolff, never diagnosed Alex with narcissistic personality disorder and agreed that Dr. Wolff is in the best position to diagnosis Alex.

¶ 11        Dr. Hatcher recommended that Lyndsey have sole decision-making responsibilities with respect to the children because "Mr. Turner is very difficult to engage in a cooperative relationship." Dr. Hatcher described Alex as "very demeaning" to Lyndsey and "extremely argumentative with *** [a]nything the mother thinks might be correct or proper to do with the

4

children." Dr. Hatcher testified that the majority of the best interests factors weighed against joint decision-making in this case.

¶ 12      Dr. Hatcher agreed with Roberts's recommended school-year parenting schedule. Dr. Hatcher had "reservations" about Alex having overnight parenting time on weekdays during the school year. Dr. Hatcher testified: "[W]hen Mr. Turner is at his best he's competent to take care of the kids. When he's not at his best, I think he struggles to take care of anybody or anything." Dr. Hatcher said his recommendations were based primarily on Alex's "behavior, his self-centeredness, [and] his disregard for other people, particularly for his wife." Dr. Hatcher explained that whether Alex "rises to the level of narcissistic personality disorder is really not the issue." Rather, Dr. Hatcher said the issue is Alex's "controlling and self-centered behavior."

¶ 13      Dr. Shapiro, an expert in clinical psychology, testified as Alex's retained expert. Dr. Shapiro opined that it was inappropriate for Dr. Hatcher to diagnose Alexander with a personality disorder because the purpose of Dr. Hatcher's evaluation was "not to diagnose either of the parties" but to conduct a parenting evaluation. Dr. Shapiro also thought Dr. Hatcher did not have "enough information to reliably diagnose Alex with having narcissistic personality disorder."

¶ 14      Dr. Shapiro interviewed Alex for two hours and concluded that while Alex "has many narcissistic traits, he also has behaviors that fly in the face of that diagnosis." In explaining Alex's narcissistic traits, Dr. Shapiro stated: "[H]e tends to be a little full of himself. He tends to be arrogant. He likes talking about how accomplished he is. *** I think he probably has some difficulty being open to some of the emotional needs of others around him. *** [H]e also thinks he knows more than other people around him." However, according to Dr. Shapiro, Alex was able acknowledge some of his shortcomings, which "somebody with narcissistic personality disorder is not quick" to do. Dr. Shapiro also found Alex to be an "attentive dad" and "more involved than

5

what my professional experience has led me to believe is typical of somebody that's been diagnosed with an actual personality disorder."

¶ 15 Dr. Shapiro found no reason to limit Alex's parenting time with his children, explaining: "[H]e seemed to be engaged, involved. The children are responsive to him, seem to enjoy time with him. He checks all the boxes, in terms of what he can do, in terms of being a parent with his children." Dr. Shapiro admitted he never saw Alex interact with his children nor did he talk to Lyndsey or the children.

¶ 16 On cross-examination and over Alex's objection, Dr. Shapiro opined that Lyndsey should have sole decision-making responsibility for the children based on the "parents' personalities." Dr. Shapiro explained: "Alex can come across as overpowering, extremely directive, that he has got the answers. She can feel intimidated. She has been submissive in the past. I don't think it seems well to an allocation of -- a joint allocation of parenting responsibility."

¶ 17 Lyndsey testified that she and Alex have lived in separate residences since June 5, 2021, with her living in Warrenville, and Alex living in Winfield. Lyndsey testified that before she and Alex separated, she was a stay-at-home mother and primarily responsible for meeting the children's day-to-day needs. Lyndsey does not believe she and Alex are able to cooperate effectively in making joint decisions regarding their children. She explained: "Alex can be overbearing and isn't interested in what I have to say hardly ever. I didn't really have a voice in the marriage. And if it was up to him now, I wouldn't have a voice in any of the decisions for my children." Lyndsey believes it is in the best interests of her children that she be awarded sole decision-making responsibility for the children. She also believes it is in the best interests of the children for her to have parenting time consistent with Roberts's recommendations.

6

¶ 18        Lyndsey testified that she and Alex made joint decisions about the children's medical providers but disagreed about whether to vaccinate the children for COVID. Lyndsey agreed that she denied Alex's requests to deviate from the parenting plan, explaining: "I was instructed by my therapist, Dr. Hatcher, and Chuck Roberts to establish firm boundaries with Alex." Lyndsey testified that since August 2021, Alex has made "a few requests" for additional parenting time, which she has denied, explaining: "I have just stuck with the parenting plan." Lyndsey agreed that Alex is a "good father."

¶ 19        Jason McGaffigan, Alex's friend and employee, testified he has known Alex for over 20 years. According to Jason, Alex interacts with his children in "an extremely loving and engaged manner." Jason also testified that "Alex prioritizes time with his children, absolutely."

¶ 20        Carlos Orr, another friend and employee of Alex's, described Alex as "a good parent" who is "very patient." Carlos agreed that Alex is a very attentive father. Carlos testified that Alex prioritizes his children when he is with them by giving them his full attention.

¶ 21        Lara Lencioni, Alex's friend and employee, testified she has known Alex for 17 years. She described Alex as a "really good dad" and "a really wonderful, kind, patient [and] empathetic father." She said Alex's children are "his number one priority." According to Lara, Alex has "adjusted his work completely" to spend time with his children during the summer. Lara testified that last summer Alex remodeled his home to make it "more kid friendly, more child centered."

¶ 22        Alex testified he is president of Corrosion Monitoring Services. He testified he adjusted his work responsibilities and reduced his travel obligations so he could spend as much time as possible with his children. He said he also "totally renovated" his home to make it the "best environment for my kids to be in." He explained: "[T]he kids are my number one priority."

¶ 23    Alex testified he left the marital residence in March of 2021. Almost every day after that, he said he asked Lyndsey for parenting time with the children. As soon as Roberts was appointed, he recommended that Alex have parenting time with the children every other weekend and three hours on Wednesdays. He and Lyndsey abided by that schedule until August 2021, when an agreed order was entered. Alex said he "[c]onstantly" asks Lyndsey for more parenting time, but she refuses, saying "let's just stick to the parenting plan." He estimated he requested additional parenting time from Lyndsey "[o]ver 100" times since August 2021. Alex explained why he wants more time with his children:

> "Well, I believe one, that, you know, naturally, they provide me with tremendous joy for my life. Okay. But beyond that, I'm committed to making sure that every second that they are with me, I'm giving them the best opportunity to succeed and develop. These are things I care about. This is what I wake up in the morning thinking about is how I can help my children. So, I need to be able to have them in order to help them."

¶ 24    Alex believes he has a lot of great attributes and should be involved in decision-making for his children because he wants "to be as involved as possible." Alex believes it is in his children's best interests that he and Lyndsey share joint decision-making. He also believes it is in his children's best interests for him to have more parenting time than the schedule recommended by Roberts because he has "handled basically all of the educational tasks related to [N.T.'s] development." Alex believes a 50/50 parenting schedule would be in the children's best interests, stating that such a schedule would provide "me with enough time that I can work on whatever developmental issues or help they need."

¶ 25    On September 6, 2022, the trial court entered a 19-page parenting allocation plan and order. The court first discussed the parties' disagreement about whether Alex suffers from narcissistic personality disorder. The court stated:

"The court finds, as a matter of fact, that Father has 'many narcissistic traits,' as Father's own expert stated. The court further notes that Dr. Shapiro's conclusion is consistent with the court's own observations of both parties. In particular, Dr. Shapiro's conclusion that the parties' respective personalities are not 'a great predictor for co-parenting' is consistent with the court's conclusions from its opportunity to observe both parties' testimony and demeanor on the witness stand.

In an abundance of caution, the court disregards Dr. Hatcher's conclusion that Father 'meets the criteria for diagnosis of Narcissistic Personality Disorder.' Out of a further abundance of caution, the court disregards Dr. Hatcher's recommendations with regard to specific parenting time and decision[-]making."

¶ 26    The court then considered the best interests factors relative to the allocation of parental decision-making set forth in section 602.5(c) of the Act (750 ILCS 5/602.5(c) (West 2020)) and determined that five factors favored Lyndsey: the parents' mental health, the ability of the parents to cooperate, parental participation in past significant decision-making, the parties' prior agreement/course of conduct regarding decision-making, and the children's needs. The court found the remaining factors were neutral or inapplicable.

¶ 27    Next, the court considered the best interests factors relative to the allocation of parenting time set forth in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2020)) and found four favored Lyndsey: the parents' caretaking functions in the last 24 months, the parties' prior agreement/course of conduct, the mental health of the parents, and the willingness of each parent

9

to place the needs of the children ahead of their own. The court found the rest of the factors to be neutral or inapplicable.

¶ 28        The court concluded it would be in the children's best interests for Lyndsey to make all significant educational, healthcare, religious and extracurricular decisions for the children, after consultation with Alex. The court further found it would be in the children's best interests for Lyndsey to be "designated as the parent with the majority of the parenting time." The court's plan awarded Alex parenting time with the children during the school year as recommended by Roberts, with alternating weekends from Friday to Monday, every Wednesday evening, and on alternating Monday evenings following Lyndsey's weekends with the children. During the summer, the parties would divide parenting time "evenly in week-long blocks of uninterrupted parenting time with no more than two weeks consecutive" for each parent.

¶ 29        Alex filed a notice of appeal, appealing "from the Order entered on September 6, 2022 by the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois, allocating parental responsibilities pursuant to 750 ILCS 5/602.10."

¶ 30                                II. ANALYSIS

¶ 31                              A. Denial of Hearing

¶ 32        Alex first argues that his rights were violated when the trial court denied him a hearing on his petition for a temporary parenting schedule, which he filed in May 2021. Lyndsey responds that we lack jurisdiction to review this argument because Alex did not include the issue in his notice of appeal.

¶ 33        The purpose of a notice of appeal is to advise the successful party of the nature of the appeal. See *In re Marriage of Betts*, 172 Ill. App. 3d 742, 745 (1988). Thus, a notice of appeal "shall specify the judgment or part thereof or other orders appealed from and the relief sought from

10

the reviewing court." Ill. S. Ct. R. 303(b)(2) (eff. July 1, 2017). An order not specified in the notice of appeal cannot be reviewed by the appellate court. See *Kievman v. Edward Hospital*, 122 Ill. App. 3d 187, 190 (1984). The only exception is when an order not specified in the notice of appeal "relate[s] directly back to the order sought to be reviewed." See *Betts*, 172 Ill. App. 3d at 745-46.

¶ 34 In his notice of appeal, Alex specified only the trial court's September 6, 2022, parenting allocation plan and order as the order from which he was appealing. Alex made no mention of the trial court's order entered in July 2021 denying him a hearing on his petition for a temporary parenting schedule, which he filed in May 2021. Additionally, the court's July 2021 order denying Alex a hearing on his petition for a temporary parenting schedule is not related to the trial court's September 6, 2022, parenting allocation plan and order. Thus, we lack jurisdiction to consider the propriety of that order and any alleged violation of Alex's rights that resulted from that order. See *Betts*, 172 Ill. App. 3d at 746; *Kievman*, 122 Ill. App. 3d at 190.

¶ 35                                              B. Admission of Evidence

¶ 36 Alex next contends that the trial court erred in allowing certain testimony and evidence to be presented at trial. Specifically, he argues the trial court erred in (1) admitting Dr. Hatcher's report into evidence, and (2) allowing Dr. Shapiro to testify that Lyndsay should have sole decision-making authority.

¶ 37 "The paramount consideration and guiding principle in determining child custody is the best interests of the child [citations], considering all relevant factors." *Johnston v. Weil*, 241 Ill. 2d 169, 180 (2011). Thus, the trial court "exercises broad discretion in admitting relevant evidence that may assist the court in arriving at a custody determination [citation], and the court should hear and weigh all relevant evidence [citation]." *Id.*

11

¶ 38    A determination regarding the admissibility of evidence is within the sound discretion of the trial court. *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 14. A reviewing court will not reverse a trial court's decision regarding the admissibility of evidence absent a "clear abuse of discretion." *Id*. "An abuse of discretion exists where no reasonable person would take the position adopted by the trial court [citation], or where the trial court acts arbitrarily, fails to employ conscientious judgment, and ignores recognized principles of law." *In re Commissioner of Banks & Real Estate*, 327 Ill. App. 3d 441, 476 (2001).

¶ 39    Additionally, a reviewing court will not disturb a trial court's decision regarding the admission of evidence unless the party asserting the error clearly demonstrates that he was prejudiced. *In re Marriage of Willis*, 234 Ill. App. 3d 156, 160-61 (1992). "Furthermore, error in the admission of evidence does not require reversal if the evidence does not materially affect the outcome." *Id*. at 161.

¶ 40                    1. Dr. Hatcher's Report

¶ 41    Section 604.10 of the Act authorizes a trial court to "seek the advice of any professional, whether or not regularly employed by the court, to assist the court in determining the child's best interests." 750 ILCS 5/604.10(b) (West 2020). The court's appointed professional is to advise the court of his opinions "in writing" and provide a copy of a written report to the court and the parties. *Id*. The court-appointed professional "shall testify as the court's witness and be subject to cross-examination." *Id*. The appointed professional's report must, at least, set forth the following:

"(1) a description of the procedures employed during the evaluation;

(2) a report of the data collected;

(3) all test results;

(4) any conclusions of the professional relating to the allocation of parental responsibilities under Sections 602.5 and 602.7;

(5) any recommendations of the professional concerning the allocation of parental responsibilities or the child's relocation; and

(6) an explanation of any limitations in the evaluation or any reservations of the professional regarding the resulting recommendations." *Id.*

¶ 42    There is no question that Dr. Hatcher's report was admissible pursuant to section 604.10(b) of the Act as a report of a court-appointed professional because it meets the requirements of that section. See *id.* Nevertheless, Alex contends that the report was inadmissible because it contained an inappropriate medical diagnosis of him.

¶ 43    We need not determine if the trial court erred in admitting Dr. Hatcher's report because the trial court specifically stated that it disregarded "Dr. Hatcher's conclusion that Father 'meets the criteria for diagnosis of Narcissistic Personality Disorder'" as well as "Dr. Hatcher's recommendations with regard to specific parenting time and decision[-]making." Because the trial court did not consider Dr. Hatcher's diagnosis of Alex or Dr. Hatcher's recommendations in reaching its conclusions in this case, any error in admitting Dr. Hatcher's report as evidence did not prejudice Alex or affect the outcome of the proceeding. See *Willis*, 234 Ill. App. at 160-61. In the absence of prejudice to Alex, we need not consider the propriety of the court's admission of Dr. Hatcher's report. See *id.*

¶ 44                                    2. Dr. Shapiro's Testimony

¶ 45    Pursuant to Illinois Supreme Court Rule 213(f), a party may identify a "controlled expert witness" who will give expert testimony at trial. See Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). "For each controlled expert witness, the party must identify: (i) the subject matter on which the witness

will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." *Id*.

¶ 46    "The information disclosed in answer to a Rule 213(g) interrogatory, or in a discovery deposition limits the testimony that can be given by a witness on direct examination at trial. *** Without making disclosure under this rule, however, a cross-examining party can elicit information, including opinions, from the witness." Ill. S. Ct. R. 213(g) (eff. Jan 1, 2018). "Parties are to be allowed a full and complete cross-examination of any witness and may elicit additional undisclosed opinions in the course of cross-examination." Ill. S. Ct. R. 213, Committee Comments (adopted March 28, 2002). Rule 213 "is to be liberally construed to do substantial justice between or among the parties." Ill. S. Ct. R. 213(k) (eff. Jan 1, 2018). "The application of this rule is intended to do substantial justice between the parties. This rule is intended to be a shield to prevent unfair surprise but not a sword to prevent the admission of relevant evidence on the basis of technicalities." Ill. S. Ct. R. 213, Committee Comments (adopted March 28, 2002).

¶ 47    Rule 213 is a limitation on the party calling the expert as a witness to prevent unfair surprise to the opposing party. *Chiricosta v. Withrop-Breon*, 263 Ill. App. 3d 132, 156 (1994). It does not restrict the opposing party from asking questions to or eliciting opinions from a controlled expert. See *id*. The admission of expert testimony under Supreme Court Rule 213 is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed absent an abuse of discretion. *Sullivan v Edward Hospital*, 209 Ill. 2d 100, 109 (2004).

¶ 48    Here, Alex disclosed Dr. Shapiro as his Rule 213(f)(3) controlled expert witness. Thereafter, Alex sought to limit Dr. Shapiro's testimony. Specifically, Alex sought to preclude Lyndsey from seeking an opinion from Dr. Shapiro about whether it was in the children's best interests for her to have primary decision-making authority. Pursuant to Supreme Court Rule

14

213(g), it was proper and appropriate for Lyndsey to elicit and obtain opinions from Dr. Shapiro on cross-examination even if those opinions were not previously disclosed by him. See Ill. S. Ct. R. 213(g) (eff. Jan 1, 2018); *Chiricosta*, 263 Ill. App. 3d at 156. Thus, the trial court did not abuse its discretion in refusing to limit Dr. Shapiro's testimony at trial.

¶ 49                                C. Allocation of Parental Responsibilities

¶ 50        Finally, Alex argues that the court erred in granting Lyndsey primary decision-making authority and the majority of parenting time.

¶ 51                                        1. Decision-Making

¶ 52        A trial court "shall allocate decision-making responsibilities according to the child's best interests." 750 ILCS 5/602.5(a) (West 2020). In arriving at that decision, the court must consider all relevant factors, including:

"(1) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to decision-making;

(2) the child's adjustment to his or her home, school, and community;

(3) the mental and physical health of all individuals involved;

(4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making;

(5) the level of each parent's participation in past significant decision-making with respect to the child;

(6) any prior agreement or course of conduct between the parents relating to decision-making with respect to the child;

(7) the wishes of the parents;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on decision-making is appropriate under Section 603.10;

(11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(12) the physical violence or threat of physical violence by the child's parent directed against the child;

(13) the occurrence of abuse against the child or other member of the child's household;

(14) whether one of the parents is a sex offender, and if so, the exact nature of the offense and what, if any, treatment in which the parent has successfully participated; and

(15) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.5(c) (West 2020).

¶ 53 A reviewing court will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless the decision is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51.

¶ 54 "In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine

the best interests of the child." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25. "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50.

¶ 55    Here, the trial court discussed each and every factor related to allocation of parental decision-making and explained its findings as to each factor. While the court found the majority of factors were neutral or inapplicable, it found five factors favored Lyndsey and none favored Alex. Most significantly, the court found the children's needs weighed against joint decision-making, explaining:

> "The court finds that joint decision[-]making is likely to result in significant difficulties in the parties' reaching agreement. The children need to have decisions made without such difficulties and without dispute and potential court involvement. The court finds that the need for decisions to be made without dispute favors sole decision[-]making to one parent over an attempt to reach decisions."

The court determined it was in the children's best interests for Lyndsey to be award primary decision-making responsibility because of Alex's "many narcissistic traits" and Lyndsey's tendency "to be somewhat submissive."

¶ 56    Alex, however, contends that the trial court erred in granting Lyndsey primary decision-making responsibility because the evidence showed he and Lyndsey were able to agree on significant issues, such as the children's medical providers and their religious upbringing. While it is true that Lyndsey and Alex were sometimes able to agree on issues involving the children, that was not always the case. When disagreements arose, Alex was overbearing and disregarded Lyndsey's opinions. As Lyndsey testified, if it were up to Alex, she "wouldn't have a voice in any of the decisions for [the] children." Such a dynamic does not support joint decision-making. See

17

*In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 49 (finding joint custody inappropriate where "the parties have too much animosity to sufficiently cooperate").

¶ 57        Furthermore, the trial court's decision-making determination was supported by the opinions of GAL Roberts and Dr. Shapiro. Roberts and Dr. Shapiro both opined that it would be in the children's best interests for Lyndsey to have primary decision-making authority. Based on the evidence presented in this case, the trial court's decision to grant primary decision-making authority to Lyndsey was not against the manifest weight of the evidence.

¶ 58                                    2. Parenting Time

¶ 59        A trial court "shall allocate parenting time according to the child's best interests." 750 ILCS 5/602.7(a) (West 2020). In arriving at that decision, the court must consider all relevant factors, including:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities or, if the child is under 2 years of age, since the child's birth;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

18

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." 750 ILCS 5/602.7(b) (West 2020).

¶ 60    On appeal, we afford "great deference to the trial court's best interests findings because that court is in a far better position than are we to 'observe the temperaments and personalities of the parties and assess the credibility of witnesses.' " *In re Marriage of Marsh*, 343 Ill. App. 3d 1235, 1239-40 (2003) (quoting *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041 (2002)). "A trial court's determination as to the best interests of the child will not be reversed on appeal unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

¶ 61    In its order, the trial court discussed each and every factor related to the allocation of parenting time. The court determined that most of the factors were inapplicable or did not favor either party, a few favored Lyndsey, and none favored Alex. The court found the most significant factor to be the "[w]illingess of each parent to place needs of the child ahead of their own." With respect to that factor, the court stated as follows:

> "[T]he court had the opportunity to observe the testimony and demeanor of each parent's testimony. Particularly striking was Father's answer when asked by his own counsel why he would like to have more parenting time with the children. Father began with what *he* gained from time with the children: 'Well, I believe one, that you know, naturally they provide me with tremendous joy for my life …' Transcript (7/28/22) at 49:15-21. This was a telling emphasis that the typed transcript alone does not fully capture. It is reminiscent of what Father's own expert, Dr. Shapiro, referred to as 'kind of the manner in which they came across' when describing how Father tends to talk about his accomplishments. Transcript

20

(7/27/22) at 50:13-14. After observing Father's tone, manner, and credibility (not limited to this example but including all of the testimony), the court believes that Father is interested first in what the children provide to him and secondarily with their needs. In contrast, the court finds that Mother has the ability to place the children's needs ahead of her own."

¶ 62    The trial court's allocation of parenting time was almost exactly what GAL Roberts recommended. The court awarded the parties equal parenting time during the summer and on holidays and awarded Lyndsey the majority of parenting time during the school year. The court's school-year schedule was supported by Roberts's testimony that it would not be in the children's best interests to have weekday overnight visitation with Alex during the school year.

¶ 63    Nevertheless, Alex argues that the trial court's allocation of parenting time in this case was against the manifest weight of the evidence because, according to him, "the evidence showed that Lyndsey has engaged in a pattern of behavior designed to interfere with, manipulate, and diminish [his] ability to as a fully engaged parent." Alex attempts to draw factual parallels between this case and *In re Marriage of Debra N*, 2013 IL App (1st) 122145. Such comparisons are rarely availing because in child custody hearings, "each case stands on its own facts." *Breedlove v. Breedlove*, 5 Ill. App. 3d 774, 776 (1972).

¶ 64    We find *Debra N*. distinguishable. In that case, the trial court awarded sole custody to the father after finding that the mother lacked credibility and engaged in "a pattern of conduct designed to harass [the father], limit his parenting time, summer, vacation and holiday time with [the child], and to potentially alienate [the child] from a healthy relationship with her father and his family." 2013 IL App (1st) 122145, ¶ 39. The appellate court affirmed the trial court's decision, finding that the mother "made attempts to thwart the [father's] efforts to visit and maintain a close

21

relationship with the child." *Id.* ¶ 56. In this case, no one but Alex has suggested that Lyndsey has attempted to interfere with his efforts to maintain a close relationship with his children. In support of his contention, Alex points to Lyndsey's refusal to give him additional parenting time when he requests it. However, Lyndsey explained that she refused Alex's requests for more time based on the advice of her therapist, Dr. Hatcher and Roberts, to set clear boundaries with Alex.

¶ 65    Based on the evidence presented in this case, the trial court's determination that it was in the best interests of the children to award equal parenting time to the parties during the summer and holidays and the majority of parenting time during the school year to Lyndsey was not against the manifest weight of the evidence.

¶ 66                                        III. CONCLUSION

¶ 67    The judgment of the circuit court of Du Page County is affirmed.

¶ 68    Affirmed.