**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230412-U

Order filed April 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| BRIAN GORR, | ) | Will County, Illinois, |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Appeal No. 3-23-0412 |
| and | ) | Circuit No. 15-D-1185 |
| | ) | |
| ANGELA GORR, | ) | Honorable |
| | ) | Domenica Ann Osterberger, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Presiding Justice McDade and Justice Brennan concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court's decision to modify by removing a restriction over the parties' medical decision-making was against the manifest weight of the evidence where it failed to address the children's best interests and provide additional provisions to remediate the parties' differences. The court abused its discretion by applying the incorrect standard to uphold the parties' joint decision-making over all significant issues.

¶ 2        The respondent, Angela Gorr, appeals the August 10, 2023, order of the Will County circuit court denying her third amended petition to modify the parenting time and joint decision-making allocation with the petitioner, Brian Gorr. We reverse and remand with directions.

¶ 3                                    I. BACKGROUND

¶ 4        The parties were married on March 1, 2008. Brian filed a petition for dissolution of marriage on July 10, 2015, and Angela filed a counter-petition soon thereafter. On November 2, 2015, the circuit court entered a joint parenting agreement and custody judgment. At the time the agreement was entered, the parties' first child, A.G., was three years old and Angela was pregnant with the parties' second child, N.G., whom she gave birth to in early 2016. The agreement delineated joint decision-making over the parties' children concerning the areas of religion, health, education, and extracurricular activities. It also set forth a regular parenting schedule with A.G. As for their unborn child, the order set forth an anticipatory parenting schedule affording Brian regular parenting time over the child's first year.

¶ 5        On February 23, 2017, Angela filed a verified petition to modify the custody judgment and to modify allocation of parenting time, requesting the appointment of a guardian *ad litem* (GAL) and the modification of the judgment to allocate parental responsibilities on a shared parenting time for both children. The court entered an agreed order on August 2, 2017, which set forth a regular parenting time schedule for both children. Subsequently, Angela filed petitions on December 15, 2017, and May 30, 2018, the latter of which sought, in part, to restrict Brian's parenting time and award Angela sole decision-making based on Brian's alleged deleterious conduct towards Angela and their children.

¶ 6        Following a hearing on Angela's petitions, the court entered an agreed order on October 1, 2018, allocating equal parenting time. The order also specified that the parties would share in

2

decision-making for their children's medical and psychological decisions, with the caveat that the parties agree to the designation of specifically identified care providers. The order designated Dr. Mark McKee as A.G.'s psychologist. The order further instructed the parties to work with McKee on a "family therapy/child behavior plan," to which the parties agreed to "reasonably participate and cooperate." Following the entry of the court's October 1, 2018, order, Angela began to file myriad petitions against Brian for his alleged failure to participate and cooperate with McKee's plan.

¶ 7        On March 13, 2019, Angela filed a petition for a professional custody evaluation pursuant to section 604.10 of the Illinois Marriage and Dissolution of Marriage Act (Act) and modification of the allocation of parental responsibilities alleging, in part, that Brian's resistance to McKee's recommended child therapy program for A.G. arose to a substantial change in circumstances warranting evaluation and modification of the October 1, 2018, order. See 750 ILCS 5/604.10, 610.5(a) (West 2018). She filed an amended petition with similar allegations on March 28, 2019. Angela filed another petition for professional evaluation on July 8, 2019, requesting the court appoint her retained professional to conduct a section 604.10(c) evaluation. See *id.* § 604.10(c). Thereafter, Brian moved to strike and dismiss Angela's petitions.

¶ 8        In August, Angela filed a petition for rule to show cause, arguing Brian's obstructionist behavior with McKee's recommendations contravened the October 1, 2018, order and requested a finding of indirect civil contempt. On September 19, 2019, the court granted Brian's motions to strike and dismiss Angela's petitions without prejudice. She repled her petitions alleging much the same 11 days later, which the court granted and appointed Angela's retained professional to evaluate the matter. *Id.*

¶ 9   On June 15, 2020, Brian filed an emergency motion seeking to prevent Angela's "unilateral[ ]" administration of attention deficit hyperactivity disorder (ADHD) medication to A.G., and two days later, the court entered an order temporarily halting either parent from giving the ADHD medication. In July, Angela filed a petition seeking the appointment of a parenting coordinator to address the ongoing contentiousness of the parties, namely regarding medical decision-making.[1]

¶ 10  In early 2021, Angela revived her rule to show cause and sought a finding that Brian abused his parenting time, alleging harmful conduct towards her and the children. She filed an emergency motion on March 19, 2021, requesting the court implement the recommendations of her retained evaluator which would afford her sole decision-making responsibilities over the parties' children.

¶ 11  Shortly thereafter, on March 22, 2021, Brian filed a petition for the appointment of his own retained professional evaluator and a motion to modify allocation of significant decision-making responsibilities pursuant to sections 602.5, 607.5, and 610.5 of the Act, alleging Angela continually flouted the October 1, 2018, order, including an instance where she allegedly administered ADHD medication to A.G. without his consultation, and her actions arose to a substantial change in circumstances. 750 ILCS 5/602.5, 607.5, 610.5 (West 2020). He requested sole decision-making power over the children in the areas of medical care and education.

¶ 12  On June 26, 2023, Angela filed her third amended petition for modification of parenting time which sought evaluation pursuant to section 604.10 of the Act and other relief. *Id.* §§ 602.5,

---

[1]It was not until May 24, 2023, nearly three years after Angela filed her petition, that the Illinois Supreme Court formally adopted Rule 909 which authorizes judicial circuits to develop a parenting coordination infrastructure by establishing programs and rules for parenting coordinators in high conflict situations. See Ill. S. Ct. R. 909 (eff. May 24, 2023).

602.7, 610.5, 603.10. Her petition chronicled Brian's alleged combative behavior towards her and alleged a general failure on Brian's part to cooperate with A.G.'s care providers, including McKee. Angela sought sole allocation of parental responsibility, a finding that Brian's behavior constituted serious endangerment, and a restriction to Brian's parenting time.

¶ 13        The record reveals that A.G. has ADHD and certain behavioral issues that tend to emerge most acutely when at school and in his mother's presence. In her various petitions and motions, Angela alleged that A.G. was also diagnosed with Oppositional Defiant Disorder (ODD) despite no indication of an affirmative diagnosis in the record. The parties' litigation centers around their fundamental disagreement in the approach to handling A.G. Reductively, Angela is aggressive in her attempt to seek care, diagnoses, and treatment for A.G. whereas Brian prefers raising A.G. with minimal medical intervention. In 2022, N.G. was diagnosed with acute flaccid myelitis (AFM), an uncommon condition caused by a viral infection to one's spinal cord which, as happened here, can cause muscle weakness and paralysis. The record indicates the parties worked together to get N.G. the medical treatment needed to address this illness.

¶ 14                                    B. Trial

¶ 15        The parties' petitions advanced to an eight-day trial on July 10, 2023. Brian's trial testimony revealed a tendency to downplay A.G.'s behavioral problems and an aversion to medical treatment and diagnosis. Brian testified he lives in Plainfield and works remotely. Both A.G. and N.G. are enrolled in School of Rock music programs, an extracurricular activity that spans both parties' parenting times. Concerning medical decisions, he testified that he did not want A.G. to attend the social skills group, as recommended by McKee. In early 2019, Brian temporarily stopped taking A.G. to therapy sessions with McKee for a two-month stretch, but he has taken A.G. to therapy consistently since that break. Brian conveyed hesitation to McKee's

5

psychiatrist recommendation. Eventually, A.G. was evaluated at McKee's recommendation by Dr. Thomas DiMatteo, who prescribed A.G. with ADHD medication. Brian opposed the prescription. He attributed A.G.'s reported behavioral issues at school to reacclimating to in-person schooling. He did not think A.G. needed an individualized education plan (IEP) based on his grades. When asked if he was opposed to A.G. being placed on a 504 plan, he responded that this course of action had not been suggested.[2] If school officials were to recommend educational plans for A.G., Brian testified that he would consider them. In October 2022, the parties came to an agreement to have A.G. undergo an evaluation by a neuropsychologist. After meeting with Angela, however, the neuropsychologist refused to proceed with her evaluation until the parties met with a family therapist. Brian testified that he believed that he was capable of making joint decisions with Angela concerning their children.

¶ 16        Angela testified that she resides in Naperville and described her employment as a hybrid work situation enabling her to work "mostly from home." She presented a zealous, one-sided approach to getting A.G. medical treatment often dispensing with or curtailing Brian's input. For instance, Angela retained Board Certified Behavior Analyst (BCBA) services—professionals that provide in-home services to work with behavioral issues—after approaching McKee with the idea. She started BCBA services before notifying Brian and later prevented him from interviewing the providers. In June 2020, Angela informed Brian *via* email that she was going to start administering A.G. ADHD medication, which resulted in Brian's emergency motion to prevent starting the medication. On the same day in which the court stayed any medications for

---

[2]Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) affords reasonable accommodations to students with disabilities through formalized educational arrangements, known as 504 plans, which are crafted to meet the students' needs.

ADHD until further investigation by the GAL, Angela emailed the GAL providing information on the medication and other concerns, to which the GAL responded, "I will not recommend medication until I have an opportunity to *** sp[ea]k to the professionals myself." Angela agreed that DiMatteo eventually withdrew A.G.'s prescription for ADHD medication and further agreed that he stated that choosing to start A.G. on medication should be a joint parenting decision. While Angela raised the possibility of placing A.G. on a 504 plan with his teachers, she agreed he had never been placed on a 504 plan. Angela testified that she cannot continue under the joint decision-making arrangement with Brian.

¶ 17    McKee, A.G.'s clinical psychologist, described the therapy, psychological testing, and consultation services which he provided A.G. beginning in 2018. He created multiple family therapy plans with which the parties have reasonably participated and cooperated. In his opinion, Brian never obstructed A.G.'s counseling with him.

¶ 18    In the spring of 2018, McKee diagnosed A.G. with ADHD. McKee has seen A.G. on about a weekly basis since this time. He explained that A.G. has difficulties in certain social situations where "he can be disrespectful" to peers. In 2019, McKee recommended a social skills program and medical evaluation for A.G. He also recommended a psychiatrist for A.G. in September 2019. Generally, Brian had reservations regarding these recommendations, which resulted in McKee tabling his recommendation for the social skills program until after the 604.10(c) evaluations concluded. McKee testified that, consistent with his diagnosis, DiMatteo also diagnosed A.G. with ADHD. After DiMatteo withdrew from A.G.'s care, McKee recommended a different psychiatrist, which Brian contested.

¶ 19    McKee clarified that it was Angela's idea to hire the BCBA. McKee did not observe any positive impact on A.G.'s behavior from his work with the BCBA. In October 2022, McKee sent

an email requesting that the parties meet with a family therapy specialist in an effort to resolve their issues surrounding A.G. without court involvement. Brian agreed to participate in this meeting; Angela did not, conveying to McKee that she was fearful of being in the same room as Brian. Based on Angela's fear, McKee withdrew his recommendation that the parties should meet.

¶ 20　　　　McKee describes A.G.'s struggles as follows:

> "his experience in the world has been having two parents that cannot agree on anything, that I think hate each other. That he's been torn between those people, and he has learned to play one against the other at times. He has been ravaged, I think, by the conflict between his parents, and he's very angry and unhappy; and, yes, he acts out sometimes. I think the lack of knowing that his parents can communicate and work together is difficult for this child."

McKee also confirmed that A.G. has stunted empathy development, which he linked to the conflict between his parents. He did not believe the parties were able to successfully co-parent.

¶ 21　　　　The parties' respective experts testified to their evaluations completed pursuant to 604.10(c) of the Act. *Id.* § 604.10(c). Brian's expert, Dr. Sol Rappaport, a licensed psychologist, testified to his custody evaluation of the Gorr family. As part of his evaluation, the parties completed questionnaires pertaining to their children, which according to Rappaport, revealed Angela sees A.G. as having "significant difficulties in multiple areas" whereas Brian sees "almost no problems." A.G.'s teacher, which the record indicates also completed the questionnaires, fell "closer to Angela, but the teacher is not seeing nearly the severity or the types of problems that Angela sees but clearly sees problems." To understand A.G.'s functioning, Rappaport ordered an autism evaluation, to which Brian initially expressed

8

disapproval but eventually consented. While A.G. exhibited features consistent with someone who has autism, the evaluator concluded the child was not on the spectrum. Rappaport opined that Brian's structure and routine were his greatest strengths as a parent, and he had an appropriate disciplinary infrastructure in place which A.G. responded to, an area with which Angela comparatively struggled.

¶ 22         Rappaport reported a concern that Brian was minimizing or not acknowledging A.G.'s significant difficulties in a school setting. "[W]hile Brian minimizes," Rappaport testified, "Angela may think things are worse than they really are." Alternatively, Rappaport believed there was a basis for A.G. to act worse around Angela and at school than he did under Brian's supervision. Regarding the parties' decision-making concerning extracurriculars, Rappaport testified that the parties disfavored activities that interfered with their parenting time. He described one instance where Brian threatened to pull A.G. out of a karate class and hire a private instructor so that Angela could not attend. Despite these disputes, Rappaport testified that there had not been substantial interference with the parties' children participating in activities. Rappaport also reported that "there is a wealth of data that shows there is not only a high level of conflict between the parents, but that the children are aware of the conflict and are exposed to it." Of the parties' relationship, Rappaport stated "[t]hey don't like each other, *** and that message is clear to the kids." This messaging indicated the parties do "not full[y] support *** the other parent." Notwithstanding these remarks, he recommended that the parties maintain their current parenting time schedule and that this schedule remained in the children's best interest. He also recommended the continuation of joint decision-making. He did not think either party's conduct constituted a serious endangerment to their children.

¶ 23        Angela's expert, Dr. Mary Gardner, is a licensed clinical psychologist who testified to her written reports based on her 604.10(c) evaluation of the Gorr family. *Id.* § 604.10(c). Gardner prepared an original 46-page report in February 2021, and issued two supplemental reports in the succeeding years. She reported that there was a pattern of Brian disagreeing with medical services for the children. Her supplemental reports focused on A.G.'s worsening behavior in the presence of his mother, Brian's deteriorating conduct towards Angela, and the parties' handling of N.G.'s medical treatment for AFM. Each report concluded with the recommendation to grant Angela sole decision-making over medical, education, and extracurricular activities.

¶ 24        Gardner testified to her belief that Brian's "method of blocking services was a way to make things difficult for Ang[ela]" later stating that she did not believe his objection to services was "unintentional." In her opinion, Brian's contempt for Angela impacted their ability to parent together and was damaging to Angela's relationship with A.G. In her most recent report, Gardner stated that Brian conveyed "unilateral information" to medical professionals regarding N.G.'s condition when bringing him to urgent care in August 2022. Her report suggested that this delayed N.G.'s AFM diagnosis. However, when asked by the court what specifically Brian relayed to the urgent care provider, Gardner was unable to substantiate this suggestion.

¶ 25        Antoinette Granholm, the GAL, testified consistent with her report filed on May 24, 2023. In her report, Granholm conveyed that the parties' children do not "have debilitating behavioral or medical issues"; rather, the "main problem" the children have is their parents. She recommended the decision-making remained unchanged, because in her opinion the "check and balance system with both parents is imperative." She testified that while the incident with N.G.'s AFM treatment was "frustrating" for the parties to wade through and that the parties caused some delay, the delay "wasn't detrimental." According to Granholm, "they communicated" and

10

N.G. "got all the therapy he needed." She also did not recommend modification of parenting time.

¶ 26                    C. Circuit Court's Ruling

¶ 27        On August 10, 2023, the court entered a written order denying Brian's petition and finding "no basis to modify the allocation of significant decision-making[ ] as requested by either party." It found the same in denying Angela's third amended petition and made supplemental findings that she failed to meet her burden of proof that Brian engaged in conduct seriously endangering their children and there was no basis to modify parenting time. Separately, the court found there was a substantial change in circumstances since the October 1, 2018, order, and in the best interest of the children, modified the order to remove any obligation to comply with the recommendations of professionals and third parties, instead placing the onus on the parties to "jointly share the responsibility to make significant decisions for their children ***." The parties were instructed to continue communicating solely through the local portal designed to facilitate parental communication, Our Family Wizard.

¶ 28        The court supplemented its order with an oral ruling from the bench which began by detailing the parties' "diametrically opposed" description of A.G. It surmised that "probably *** mom is exaggerating and probably dad is minimizing" A.G.'s behavioral issues. It downplayed the utility of the parties' experts, finding both marred by biases and concluding "[n]either *** helped me very much at all." Conversely, it found McKee's testimony both credible and helpful.

¶ 29        According to the court, an accurate portrayal of any of A.G.'s untreated disorders remained unclear even after trial, in large part "because both of his parents engage in such horrible behavior toward each other" which got in the way of diagnoses. It rejected Angela's argument that Brian tried to thwart medical care and treatment for A.G. and further found no

11

evidence that Brian deliberately acted for the purpose of undermining Angela, her medical opinions, or her parenting.

¶ 30    The court admonished both parties. It stated Angela overly and unnecessarily lobbies for her opinions instead of working with Brian to consult with A.G.'s providers and make decisions together. The court stated Angela weaponizes her opinions, and when professionals do not validate her, she "ups her game." She then attempts to use higher authorities to hold her opinions over Brian's head. The court added "she is not above lying to accomplish that." If left under Brian's care, the court believed he would not pursue any help for A.G. at all, "therapy or otherwise."

¶ 31    The court held that Brian did not (1) engage in conduct that seriously endangered either child, (2) there was no basis or need in the children's best interest to modify Brian's parenting time, and (3) pursuant to the counseling statute, there is no basis to order Brian and the children to engage in Gardner's recommended therapy. When describing its rationale for denying the respective motions for sole decision-making it made the following observations: While well-intentioned, Angela is untrustworthy and lacks clarity in judgment. Granting sole decision-making to Brian would be equally detrimental due to the likelihood of inaction. According to the court, "[u]ltimately, the[ ] [parties] need to act together. As the GAL had pointed out, it may not be the best-case scenario, but there isn't a best-case scenario here. The check and balance inherent in joint decision-making is really the only option available." It noted N.G.'s treatment as a demonstration of the parties being able to act together appropriately.

¶ 32    Angela timely appealed.

¶ 33                                II. ANALYSIS

12

¶ 34        Angela raises two appellate arguments about the circuit court's ruling governing the parties' parental decision-making responsibilities. First, she contends the court erred when modifying the parties' parental medical decision-making arrangement by removing an obligation for the parties to abide by the recommendations of professionals and treatment providers when making significant decisions for their children. Second, she asserts that based on the parties' inability to co-parent, the court erred by not dissolving joint decision-making in her favor.

¶ 35                    A. Modification of the Parties' Allocation of Parental Responsibilities

¶ 36        Angela argues that the court's modification of the parties' medical decision-making responsibilities is against the manifest weight of the evidence because such an arrangement is incompatible with A.G.'s needs and not in the child's best interest.

¶ 37        We begin by clarifying the scope of the October 1, 2018, order, which was modified by the circuit court. Angela asserts that the circuit court erred in fashioning a "controversial" solution by "striking the mandate to comply with professional recommendations." Nowhere in the order was there a requirement for the parties to comply with professional recommendations in decision-making concerning their children's health. The term "recommendation" never appears in the order. Rather, the order merely provides that the parties were to work with McKee on a "family therapy/child behavior plan," to which the parties agreed to "reasonably participate and cooperate." It appears a misconstruction of what the order required of the parties fueled Angela's various petitions against Brian.

¶ 38        On appeal, neither party's appellate brief directs our attention to, or even cites, a modification standard. To further muddy the waters, Angela cited two modification sections, 610.5 and 603.10, in her third amended petition for modification. 750 ILCS 5/610.5(c), 603.10(b) (West 2022). After an extensive review of the record, we believe the October 1, 2018,

13

order's inclusion that the parties were to "reasonably participate and cooperate" in McKee's therapy plan served as a restriction over their significant decision-making responsibilities for the healthcare of their children, namely A.G. 750 ILCS 5/603.10(a)(1), (9) (West 2022); see *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 46. The circuit court's modification of removing this restriction is therefore governed by section 603.10 of the Act. 750 ILCS 5/603.10(b) (West 2022). Section 603.10(b) allows for the modification of an order that restricts parental responsibilities if,

> "after a hearing, the court finds, by a preponderance of the evidence that a modification is in the child's best interests based on (i) a change of circumstances that occurred after the entry of an order restricting parental responsibilities; or (ii) conduct of which the court was previously unaware that seriously endangers the child." *Id.*

In determining whether to modify under this subsection, the court is instructed to consider four nonexhaustive factors, which are:

> "(1) abuse, neglect, or abandonment of the child;
>
> (2) abusing or allowing abuse of another person that had an impact upon the child;
>
> (3) use of drugs, alcohol, or any other substance in a way that interferes with the parent's ability to perform caretaking functions with respect to the child; and
>
> (4) persistent continuing interference with the other parent's access to the child, except for actions taken with a reasonable, good-faith belief that they are necessary to protect the child's safety pending adjudication of the facts underlying that belief, provided that the interfering parent initiates a proceeding to determine those facts as soon as practicable." *Id.*

14

¶ 39       We review modification judgments under the manifest weight of the evidence standard. See *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). Further, a circuit court's determination as to the best interests of the child will not be reversed unless its determination is clearly against the manifest weight of the evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. "A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent." *Id.*

¶ 40       The basis of the circuit court's modification, as explained by the court through its oral ruling, was the change in circumstances resulting from the parties' inability to adhere, in good faith, to the provision outlining reasonable participation and cooperation with McKee's therapy plans.[3] The record supports the court's finding that since the entry of the October 1, 2018, order, a change of circumstances has occurred whereby Angela sought care providers' recommendations to advance her approach to procuring medical care for her children, namely A.G. These efforts resulted in circumventing Brian from certain decision-making processes. Angela's construction of the order motivated her use of comments from the children's healthcare providers as dictates and leverage against Brian which created an unsuitable environment for the parties to collaborate and procure adequate care for A.G.

¶ 41       However, the court's modification must be in the "child's best interest" and we hold that the court erred by singularly focusing on the parties' shortcomings when deciding to modify their arrangement. 750 ILCS 5/603.10(b) (West 2022). While we afford the court's modification decision great deference due, in part, to its superior position for determining a child's best

_____

[3]The court's oral ruling identified a "change in circumstances" whereas it found a "substantial change in circumstances" in its written order. The qualifying term "substantial" is not present in section 603.10's modification subsection and therefore, only a lesser finding of a "*change of circumstances* after the entry of an order restricting parental responsibility" is required to modify under this standard. (Emphasis added.) 750 ILCS 5/603.10(b) (West 2022).

interest, there is no indication in the record that the court considered the children in modifying the October 1, 2018, order. *Bates*, 212 Ill. 2d at 516. Although the court prefaced its decision to modify by stating that its decision was "in the children's best interest," it failed to elucidate how removing the restriction to reasonably participate and cooperate in McKee's therapy plans was in A.G.'s best interest. 750 ILCS 5/603.10(b) (West 2022). It also failed to identify which modification provision it was applying.

¶ 42 Furthermore, the modification does nothing to address the parties' animosity and conflict. While medical decision-making has reverted to the parties, they are limited to discussing their disagreements on potential medical courses of action over Our Family Wizard. Without clarification as to how this arrangement serves the parties' children's best interest and will not promote continued impasses, we hold that the court's decision to modify the allocation agreement was manifestly erroneous. On remand, the court must review its modification decision through the best interests of the parties' children. If it concludes that modification is necessary, it should fully explain how such an arrangement remains compatible with the children's best interests in light of the parties' differing opinions regarding the best approach to address decision-making, namely A.G.'s ADHD and consequent behavioral and educational difficulties.

¶ 43                                    B. Joint Decision-Making

¶ 44 Angela next asserts that the circuit court erred by failing to allocate all significant parental decision-making responsibilities to her. A circuit court must allocate decision-making responsibilities according to the child's best interests. 750 ILCS 5/602.5(a) (West 2022). This entails the allocation to "one or both parents" of significant decision-making responsibility over the issues of education, health, religion, and extracurricular activities. *Id.* § 602.5(b).

16

¶ 45    Section 610.5 of the Act permits a party to seek the modification of a judgment allocating parental decision-making responsibilities. *Id.* § 610.5. Section 610.5(c) provides that:

> "the court shall modify a[n] *** allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.* § 610.5(c).

¶ 46    Accordingly, the court conducts a two-part test when determining whether to modify the allocation of parental responsibilities. First, the court must determine whether the movant has established, by a preponderance of the evidence, that a substantial change in circumstances of the child or parents occurred since the last allocation judgment. *Id.* If the movant has met his or her burden, the court then must make a finding that the modification is necessary to serve the best interest of the child. *Id.* In the context of modifying the allocation of significant parental decision-making, section 602.5(c) of the Act directs the court to consider fourteen relevant factors and one catchall factor to determine a child's best interest. *Id.* § 602.5(c). One of the fifteen factors enumerated in section 602.5(c)—"the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision-making"—is Angela's primary focus on appeal. *Id.* § 602.5(c)(4). Furthermore, Angela maintains that the history of conflict in relation to A.G.'s medical decision-making supports the dissolution of the joint decision-making over the parties' children in its entirety.

¶ 47    "The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor." *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. "It is no

17

small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Id.* ¶ 50. We defer to the circuit court's credibility determinations and do not reweigh evidence or assess witness credibility to set aside its decision "simply because a different conclusion may have been drawn from the evidence." *Id.* ¶ 51. However, a court abuses its discretion where it applies the incorrect legal standard. See *Callinan v. Prisoner Review Board*, 371 Ill. App. 3d 272, 277 (2007).

¶ 48 Based on the record before us, we hold that the court applied the incorrect standard in denying the parties' respective petitions for decision-making. It is unclear from the record whether the court imputed its finding of a "change in circumstances" that supported its modification concerning a restriction over the parties' medical decision-making to a "substantial change" in circumstances that is required to modify under section 610.5 of the Act. 750 ILCS 5/610.5(c) (West 2022). The question of whether the parties' exhibited hostility in the area of one significant decision-making area—medical—presented a substantial change in circumstances warranting the parties' request for the reallocation of decision-making over all statutorily identified significant issues is a nuanced distinction that seemingly went unexplored by the court. Brian petitioned for the sole apportionment of decision-making responsibilities over the significant issues of his children's education and health. Angela's third amended petition sought "sole allocation of parental responsibility" over her children, which would include sole responsibility over education, health, religion, and extracurricular activities. *Id.* § 602.5(b). In denying their respective requests, all that was provided in the court's written order was that it found "no basis to modify the allocation of significant decision making[ ] as requested by either party." The court's oral supplementation provided that "[i]nsofar as decision-making" neither party was suited as sole-decisionmaker, because Angela lacks trustworthiness and clarity in

18

judgement but the court also lacked confidence that Brian would get his children the care they needed. We make no opinion on whether Brian or Angela have demonstrated a substantial change in circumstances; rather, we are unable to discern from the record whether the court considered the parties' petitions through the appropriate legal standard and constraints delineated in section 610.5. *Id.* § 610.5(c).

¶ 49    In so holding we express no opinion as to the court's finding that the parties' respective deficiencies posed a greater danger if either were granted as sole decision-makers over their children. The court's decision to maintain the joint decision-making as a "check and balance" against the parties was consistent with the GAL's recommendation and may be in the parties' children's best interest. Nonetheless, we hold that the foundation of the court's decision to uphold the parties' joint decision-making was unsupported without an analysis of whether (1) the parties supported their petitions by showing a substantial change in circumstances had occurred, and if so (2) whether modifying is necessary to serve the children's best interest. Accordingly, we conclude that the court abused its discretion. We reverse and remand this cause with directions to consider the parties' joint decision-making arrangement through the lens of the requisite statutory factors under sections 602.5 and 610.5 of the Act. *Id.* §§ 602.5(c), 610.5(c). On remand, we encourage the court to consider the tools provided to it in the Illinois Supreme Court Rules and the Will County local rules for high conflict parents.[4]

¶ 50                                III. CONCLUSION

---

[4]This cause was brought pursuant to Illinois Supreme Court Rule 311(a), which provides a deadline for an appellate court's decision within 150 days after the filing of a notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Due to administrative issues, the appellant required two motions to supplement to provide a complete record on appeal. Given that this delay resulted in appellee's response and appellant's reply briefs being filed after the 150-day deadline, we find good cause exists to extend the time for this decision.

19

¶ 51        The judgment of the circuit court of Will County is reversed and this cause is remanded with directions consistent with this order.

¶ 52        Reversed and remanded with directions.