**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250467-U

Order filed January 22, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| In re THE MARRIAGE OF STAVROS GEORGIKOS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | Appeal No. 3-25-0467 Circuit No. 19-D-1085 |
| ELIZABETH GEORGIKOS, | ) ) ) | The Honorable Neal W. Cerne, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Justices Brennan and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: The circuit court's finding that there was a substantial change in circumstances since entry of the original allocation judgment in 2019 and modifications of the 2019 allocation judgment were in the best interest of the child and were not against the manifest weight of the evidence. The circuit court's order finding that the father's conduct constituted a serious endangerment to the child's mental health was not against the manifest weight of the evidence and the temporary restriction on parenting time was not an abuse of discretion.

¶ 2    Following an evidentiary hearing, the trial court stripped Stavros Georgikos of his parental decision-making authority relating to education, extracurricular, and medical matters. The trial judge also required temporary supervised visitation and placed time limits on visitation. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4    Stavros and Elizabeth married on August 22, 2015, and have one child, A.G., who is now nine. Appellant Stavros filed for dissolution on June 14, 2019, and Appellee Elizabeth filed a counter-petition shortly after. In late 2019 and early 2020, the parties entered a parental allocation judgment and a marital settlement agreement. They agreed to joint decision-making authority, significant consideration of A.G.'s interests regarding extracurricular activities, and equal parenting time. They co-parented without returning to court until February 2023.

¶ 5    In February 2023, Elizabeth filed a petition for rule to show cause alleging unpaid child support. The next day, she petitioned to enforce or modify the allocation judgment regarding routine medical care and A.G.'s school placement. The parties disagreed on schooling and certain vaccinations. The court ordered mediation, but the process was delayed until late March because Elizabeth did not contact the mediation center. Despite the mediation order, she submitted a school registration for her preferred school before mediation occurred; the school later declined to admit A.G. Mediation ultimately took place on April 6, 2023, but resolved none of the disputed issues.

¶ 6    An agreed order entered on April 18, 2023, set A.G.'s school placement, requiring only those vaccinations necessary for school enrollment, and temporarily abated Stavros's child support. Disputes continued, including Stavros seeking a religious exemption for the state vaccination recommendations in August 2023, and Elizabeth seeking to enforce the court's order for vaccination and registration in school. An August 22, 2023, order limited required vaccines to those needed for school, and A.G. was subsequently vaccinated and enrolled.

¶ 7        The parties filed numerous motions. Court orders in late 2023 limited their communications and required them to begin co-parenting therapy. Each party also sought the appointment of a guardian *ad litem* (GAL). The GAL was reappointed in March 2024, discharged in April 2024, and appointed again in May 2024 after further conflict. During this period, Stavros posted critical online reviews of the GAL, which he was ordered to remove.

¶ 8        In May 2024, Elizabeth moved to modify the decision-making and parenting time aspects of the judgment for dissolution. In June 2025, Stavros sought appointment of a parenting coordinator. Both matters proceeded to trial. A five-day trial took place in August 2025. Only the parties and the GAL testified.

¶ 9        Elizabeth described the parties' co-parenting counseling, the 2023 orders concerning school and vaccinations, and her concerns that Stavros resisted recommended medical care. She testified that A.G. was diagnosed with enlarged tonsils, an obstructed airway, recurring ear infections, and moderate hearing loss, and that specialists recommended ear tubes and removal of tonsils and adenoids. She stated that Stavros questioned or challenged medical recommendations, cancelled appointments—including a court-ordered sleep study—and contacted providers repeatedly, leading to A.G.'s discharge from two specialists.

¶ 10       She also testified about disputes at A.G.'s dental appointments, Stavros's objections to x-rays, and the difficulties the practice reported. Additional areas of concern included Stavros's attempts to involve A.G. in his own therapy sessions, his scheduling of an unrecommended second sleep study, and conflict over extracurricular activities. Elizabeth stated that Stavros rarely brought A.G. to team practices or meets, while she believed participation was important for A.G. She also described issues surrounding a phone Stavros gave A.G. and her belief that he discussed litigation with the child.

¶ 11     During cross-examination, multiple lines of Stavros's questioning were limited or barred by the court. Elizabeth acknowledged telling Stavros she did not intend to proceed with a sleep study, despite planning to do so, and confirmed that A.G. passed a later hearing test required for kindergarten.

¶ 12     The GAL testified that she had been involved in the case both before and after the divorce. She stated she received a high volume of emails from Stavros and that he had posted negative reviews about her office. Some of the emails demanded that she make changes to her report regarding recommendations pertaining to A.G.'s medical care. The GAL did not find the thousands of emails received from Stavros to be a dad advocating for his son; instead, they demonstrated Stavros's "inability to control [his] actions and [his] responses." She reported that A.G. appeared to repeat some of Stavros's language during interviews indicative of being coached to respond in a certain manner and that earlier interviews showed more neutral attitudes. She relied on information from A.G.'s ENT and dentist, both of whom expressed concerns about Stavros's conduct and the frequency of his requests for records. She characterized the parties' communication as extensive, one-sided at times, and unproductive, and noted ongoing difficulty in collaborative decision-making.

¶ 13     The GAL opined that the parties did not have the ability to co-parent and make decisions jointly for A.G.'s healthcare-related needs and that it was in A.G.'s best interest for Elizabeth to have sole decision-making for his healthcare-related needs. She believed it was unnecessary for Stavros to communicate with healthcare providers outside of the appointments and that he should be able to attend healthcare appointments but only if he was not disruptive. The GAL did not believe Stavros has the ability to put A.G.'s healthcare needs above his own preferences. She had no concerns with Elizabeth having sole decision-making for A.G.'s healthcare-related needs.

¶ 14 The GAL testified that Stavros was inconsistent in bringing A.G. to extracurricular activities, did not support the activities Elizabeth enrolled A.G. in, and discouraged A.G. from participating in such activities. The GAL thought both parents should have input into A.G.'s extracurricular activities but was unsure whether Stavros would respect A.G.'s wishes with respect to certain activities over others.

¶ 15 Stavros also testified. He stated that he filed a petition seeking a "religious" exemption only for the HPV and COVID vaccines and sought Elizabeth's consent before doing so. At her request, he canceled the vaccination appointment. Stavros was hesitant about ear tube surgery because he found it invasive, though he had no issues administering medication to A.G. and always did so. He attended the appointment with A.G.'s ENT where surgery was discussed, and he disagreed with that course of treatment. Stavros testified that he opposed surgery because he believed A.G.'s body was a temple made perfect by God.

¶ 16 Stavros testified that he wanted to bring A.G. to one of his therapy sessions to improve their relationship but agreed not to proceed after Elizabeth objected and instead planned to seek court approval. He also wanted A.G. to see a nutritionist at the recommendation of neighbors, which Elizabeth opposed. Stavros sent Elizabeth a list of suggested products and practices for A.G., emphasizing they were recommendations and never demands.

¶ 17 Stavros testified that he opposed restoring certain teeth based on recommendations from orthodontist friends. At a November 2024 dental appointment, Dr. Jerry asked Stavros to leave the room, and A.G. did not receive further treatment from that provider. Stavros later referred to Dr. Jerry as an "asshole" in a conversation with the dental office receptionist, describing him as abrasive toward a first-time father. In January 2025, Stavros contacted the office again to request that its notes reflect that both parents were effectuating the transition and that Elizabeth would

coordinate a refund. Stavros also posted negative online reviews about Dr. Jerry, which he later removed.

¶ 18        Stavros testified that he purchased A.G. an iPhone at age three with Elizabeth's agreement, though she objected at times. A.G. had access to the phone while with Stavros. A.G. had his own bedroom at Stavros's home but chose to sleep with him. Stavros explained that he believed healing energy passed between them during sleep, noting that many cultures sleep closely. The court commented, "Well, their living conditions are a little bit different, aren't they." Stavros also testified that his home security system recorded continuously and that Elizabeth had asked him not to record her.

¶ 19        On August 26, 2025, Stavros testified regarding the parties' coparenting history since the 2019 allocation judgment, stating he had been an involved and loving father. However, disputes later arose regarding school enrollment due to the parties living in different districts, which was resolved only after Elizabeth attempted to enroll A.G. unilaterally. Stavros testified that he was actively involved in A.G.'s school, including volunteering and organizing a class Christmas party. A.G. performed well academically and had minimal absences.

¶ 20        Immediately after closing proofs on August 28, 2025, the court entered a temporary order awarding Elizabeth sole decision-making authority over all issues and suspending Stavros's parenting time, finding him an "endangerment to the minor child." The court indicated that a written ruling would follow.

¶ 21        Stavros filed an emergency motion to reconsider on August 29, 2025, arguing the suspension eliminated all contact with his son for the first time. The trial judge denied the motion, stating that while individual behaviors were not endangering, their cumulative effect constituted endangerment, and ordered supervised parenting time.

¶ 22    On September 9, 2025, the court issued its written decision modifying the allocation judgment, awarding Elizabeth sole decision-making on all issues despite the GAL's recommendation that such authority be limited to medical decisions. The court temporarily ordered supervised parenting time for two weeks with conditions, after which parenting time reverted to unsupervised alternating weekends and Wednesday evenings.

¶ 23    The trial court's order is detailed and thoughtful. While it is too long to summarize, it is consistent with the trial judge's statements in open court that Stavros was "demonstrating to the court your method of how you just harass[es] and berate[s] people." This behavior was directed to individuals that Stavros did not agree with, including Elizabeth, the GAL, and some of A.G.'s medical/dental providers. The trial court found that the parties' communication had been an ongoing problem and that Stavros used a "harassing, bombarding [and] berating manner" to communicate. The court observed that, while listening to a recording Stavros made, the child "drops the F-bomb" and Stavros laughed at it and laughed at it again in the courtroom. The court found that Stavros was coaching the child inappropriately, telling A.G. what to say to his mother, and that it "should be used in parenting classes as an example of how not to talk to your child." This conduct resulted in undermining and alienating A.G. from Elizabeth. The court concluded that the conversation demonstrated an endangerment to A.G.'s mental health and to his relationship with his mother. The judge remarked that when he heard the recording he was "ready to terminate parenting time at that time on the spot *** [because] the tape is terribly offensive." The court stated that it is "obvious *** that the child's suffering by the conduct" and the tape he heard is the "most alienating tape I have ever heard." At one point the court stated that the recording was the "most horrific interview I have ever heard of a minor child. I hope it never ever happens again."

7

¶ 24 The court noted that court orders had to be issued for A.G. to receive the necessary vaccinations to register for school, to determine A.G.'s school, to temporarily restrain Stavros from harassing, intimidating, or threatening Elizabeth, and to restrain Stavros from berating and bullying the GAL in an attempt to intimidate its witness.

¶ 25 The judge found that Stavros berates A.G.'s doctors, his questioning of Elizabeth throughout the trial was berating, and that he simply "bombards people until he gets his way." The request that Stavros made for the child to use special soap, gloves at school, hand sanitizer with gloves, and sleeping with the child to "transfer energy" all show that Stavros needs psychotherapy. The requests and sleeping behavior, along with Stavros not regularly taking A.G. to extracurricular sport activities chosen by Elizabeth, appear to denigrate Elizabeth's role as a parent.

¶ 26 The court further found Stavros interferes with A.G.'s medical and dental care by causing serious delays in care, cancelling appointments, including those ordered by the court, and engaging in conduct toward the providers and/or their staff that result in the providers being no longer willing to provide care.

¶ 27 Noting the GAL found A.G. to be calm, polite, and not directed in his answers, and Elizabeth's approach to healthcare to be within normal medical guidelines, the judge found Elizabeth's actions with A.G. appropriate.

¶ 28                                                    II. ANALYSIS

¶ 29 On appeal, Stavros raises two basic issues. First, he argues that the trial court's decision to give Elizabeth sole decision-making authority for education, extracurricular activities, and medical matters was contrary to the manifest weight of the evidence and contrary to the child's best interest. Second, he argues that the trial court's parenting time orders were contrary to the manifest weight of the evidence because: (a) there was no substantial change in circumstances to justify the

8

parenting time order and (b) the reduction in parenting time and the imposition of a supervision order were not in A.G.'s best interest.

¶ 30          A. Modification of Decision-Making Authority and Parenting Time

¶ 31          The Marriage and Dissolution of Marriage Act (Act) defines "parental responsibilities" as including "both parenting time and significant decision-making responsibilities with respect to a child." 750 ILCS 5/600(d) (West 2024). Section 610.5 of the Act governs judicial modification of parental allocations. *Id*. § 610.5. Specifically, section 610.5(c) provides:

> "Except [in circumstances not relevant to this appeal], the court shall modify a parenting plan or allocation of judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interest." *Id*.

¶ 32          Modification judgments are reviewed under the manifest weight of the evidence standard. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. When determining whether a judgment is contrary to the manifest weight of the evidence, we view the evidence in the light most favorable to the appellee, and where the evidence permits reasonable inferences, we accept those inferences that support the court's order. *Bates*, 212 Ill. 2d at 515. "Custody determinations are "afforded 'great deference' because 'the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child.' " *Id*.

9

¶ 33     Whether a substantial change in circumstances has occurred is a factual question reviewed under the manifest weight of the evidence standard. *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 31. The court considers the totality of the circumstances in determining if a substantial change in circumstances has occurred. *Id*. ¶ 33; *In re Marriage of Valus*, 2023 Il App (3d) 220247-U, ¶ 28 (finding substantial change in circumstances following mother's unilateral decision not vaccinate child contrary to allocation order and agreement of the parents); *In re D.R.B.* 2023 IL App (1st) 221074-U, ¶ 65 (substantial change in the circumstances found where the child was three years older, animosity between the parents developed resulting in increased litigation between the parents, and the parents were unable to cooperate jointly for decisions related to the child).

¶ 34     The initial allocation judgment was entered in November 2019, when A.G. was two years old and not enrolled in school. As noted by the trial court, at the time of the modification request, A.G. was 8 years old and enrolled in grammar school. Further, the evidence demonstrates that starting February 2023, the parties have been involved in a significant amount of litigation regarding decisions related to A.G.'s education, medical and dental care, and extracurricular activities. In addition, the evidence demonstrates that the parties rarely, if ever, can communicate and cooperate jointly when it relates to matters related to A.G. Based on the totality of the evidence, the trial court's finding of a substantial change in the circumstances was not against the manifest weight of the evidence.

¶ 35     Stavros argues that A.G.'s increased age and the need for litigation as to decision-making and parenting do not rise to a substantial change in circumstances. Stavros's argument, based on one factor and downplaying the extensive and contentious litigation history since the 2019 allocation judgment, does not address the totality of the circumstances. The record contains

sufficient evidence supporting the court's conclusion that the totality of the evidence demonstrates a significant change of conditions.

¶ 36        Allocation of significant decision-making responsibilities, including education, health (including medical, dental, and psychological needs), and religion, are to be determined based on the child's best interest. 750 ILCS 5/602.5 (West 2024). In determining the child's best interests with respect to decision-making, the court is required to consider all relevant factors, including: (1) the wishes of the child, (2) the child's adjustment to his home, school, and community, (3) the mental and physical health of individuals involved, (4) the ability of the parents to cooperate to make decisions, or the level of conflict between the parties that may affect their ability to share decision making, (5) each parent's past participation in past significant decision-making, (6) prior agreements or course of conduct between the parents relating to decision-making with respect to the child, (7) the wishes of the parents, (8) the child's needs, (9) the distance between the parties' residences, transportation, schedules, and the ability of the parents to cooperate in the arrangement, (10) whether a restriction on decision-making is appropriate under section 630.10, (11) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, (12) any physical violence or threat of physical violence by the child's parent directed against the child, (13) any occurrence of abuse against the child or other household members, (14) whether either parent is a sex offender, and (15) any other relevant factor. *Id*. § 602.5(c).

¶ 37        Similarly, the allocation of parenting time is determined according to the child's best interest, and the court is required to consider all relevant factors, including: (1) the wishes of each parent, (2) the wishes of the child, (3) the amount of time each parent spent performing caretaking functions to the child in the 24 months preceding the filing of any petition for allocation of parental

11

responsibilities, (4) any prior agreement or course of conduct between the parents relating to the caretaking of the child, (5) the interaction and interrelationship of the child with his parents, (6) the child's adjustment to his home, school, and community, (7) the mental and physical health of all individual's involved, (8) the child's needs, (9) the distance between the parties' residences, transportation, schedules, and the ability of the parents to cooperate in the arrangement, (10) whether a restriction on parenting time is appropriate, (11) any physical violence or threat of physical violence by the child's parent directed against the child, (12) the willingness and ability of each parent to place the child's needs ahead of his or her needs, (13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, (14) any occurrence of child abuse, (15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender, (16) either parents military family-care plan, and (17) any other relevant factor. *Id.* § 602.7. Equal co-parenting arrangements have been set aside in cases where the evidence clearly shows the parents have too much animosity to be able to cooperate. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 47.

¶ 38        The record contains sufficient support for the court's conclusion of modification of both decision-making authority and parenting time. The court was presented with evidence that corresponds with the factors outlined in section 602.5 (decision-making) and section 602.7 (parenting time), including but not limited to the mental health of the individuals involved, the ability of the parents to cooperate to make decisions, the level of conflict between the parties that may affect their ability to share decision making, each parent's past participation in past decision-making and caretaking functions, prior agreements and course of conduct between the parents relating to decision-making and caretaking of the child, the wishes of the parents, the child's needs, the willingness and ability of each parent to facilitate and encourage a close and continuing

12

relationship between the other parent and the child, the interaction and interrelationship of the child with his parents, whether a restriction on parenting time is appropriate, and the willingness and ability of each parent to place the child's needs ahead of his or her needs. We cannot reweigh the evidence or reassess the parties' and GAL's credibility simply because their testimony could support a different outcome. In re Marriage of *Gorr*, 2024 IL App (3d) 230412, ¶ 46.

¶ 39    Stavros argues that altering the decision-making responsibilities and parenting time were not in A.G.'s best interest. Stavros contends that he did not make decisions that harmed A.G., areas of disagreement were eventually resolved, he has been involved in all decisions and parenting related to A.G., all conduct was done with the intention of A.G.'s best interest, and A.G. is thriving. Further, the trial court relied too heavily on the recorded conversation between himself and A.G. in finding that Stavros endangers A.G.'s mental health and A.G.'s relationship with Elizabeth. Stavros's argument essentially asks this court to reweigh the evidence and reassess the witnesses' credibility, which we cannot do. *Id.* As discussed above, the record contains sufficient support for the court's conclusion that modification of the decision-making and parenting time was in A.G.'s best interest.

¶ 40                      B. Temporary Restriction in Parenting Time

¶ 41    Allocation of parenting time itself is determined based on the best interest of the child. 750 ILCS 5/602.7(a) (2024). Section 602.7(b) provides that "the court shall not place any restriction on parenting time as defined in Section 600 and described in Section 603.10, unless it finds by a preponderance of the evidence that a parent's exercise of parenting time would seriously endanger the child's physical, mental, moral, or emotional health." *Id.* § 607.2(b); 750 ILCS 5/603/10(a) (West 2024) (requiring the court to enter orders necessary to protect the child if it finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the

13

child's mental, moral or physical health or significantly impairs the child's emotional development). A restriction of parenting time includes supervision. 750 ILCS 5/600(i). Accordingly, before restricting parenting time, a trial court must find a parent's conduct seriously endangers the child. *Id*. § 607.2(b), 603/10(a); *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 43. A court's finding of serious endangerment is reviewed under the manifest weight of the evidence standard. *Id*.

¶ 42    The trial court's finding of serious endangerment is not against the manifest weight of the evidence. The evidence at trial established that Stavros was undermining Elizabeth's parenting, attempted to coach A.G. before A.G. met with the GAL, and recorded a conversation he had with A.G. in which Stavros leads A.G. to discuss that he dislikes baseball and Stavros attempts to show he is the better parent because he will try to get Elizabeth to understand A.G.'s wishes. In addition, the GAL testified that in a later interview with A.G., A.G. complained about certain sports and Elizabeth, unlike previous interviews.

¶ 43    Stavros argues that his actions do not demonstrate he endangered A.G.'s mental, moral, or physical health; instead, they show "he is an active and involved parent who cares deeply about his child's well-being." In addition, Stavros argues the trial court "overreacted" to the recorded conversation between himself and A.G. As indicated, the evidence supports the trial court's finding that Stavros is an endangerment to A.G.'s mental health and relationship with his mother; we will not reweigh the evidence relied upon by the court. *Gorr*, 2024 IL App (3d) 230412, ¶ 16.

¶ 44    Stavros further argues that the restriction was arbitrary and unrelated to the trial court's concerns. This argument goes to what restriction the court determines is necessary to protect the child. *Hipes*, 2023 IL App (1st) 230953, ¶ 54. A trial court's determination that certain restrictions are necessary is reviewed under the abuse of discretion standard. *Id*. "A court abuses its discretion

14

when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 45 We find the trial court did not abuse its discretion in requiring two weeks of supervised visitation during which time Stavros would only speak positively about Elizabeth, be supportive of A.G.'s activities, and to allow time for Stavros to attend a parenting class. This temporary restriction reasonably attempts to prevent possible mental health effects caused by Stavros undermining Elizabeth's parenting and coaching of A.G. against his mother and the activities she has chosen for A.G. to participate in. We also note that the restriction only restricts Stavros's parenting time for two weeks to allow Stavros to begin speaking positively about Elizabeth and completing a parenting class.

¶ 46                                  III. CONCLUSION

¶ 47 For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 48 Affirmed.