**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 250246-U

Order filed October 8, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| ALEXANDER TURNER, | ) | Du Page County, Illinois, |
| | ) | |
|     Petitioner-Appellant, | ) | Appeal No. 3-25-0246 |
| | ) | Circuit No. 21-D-254 |
|     v. | ) | |
| | ) | |
| LYNDSEY TURNER, | ) | Honorable |
| | ) | Neal W. Cerne, |
|     Respondent-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: The trial court's findings regarding the children's best interest were not against the manifest weight of the evidence, nor was its denial of petitioner's petition to modify the allocation judgment an abuse of discretion. The trial court's evidentiary rulings did not prejudice petitioner. Affirmed.

¶ 2    Petitioner, Alexander Turner (Alex), appeals the trial court's denial of his petition to modify the allocation of parenting time and decision-making responsibility that was set forth in

the September 6, 2022, allocation judgment, as well as the court's evidentiary rulings during the modification proceedings.

¶ 3                                     I. BACKGROUND

¶ 4        The parties were married on March 6, 2016, and had two children: N.T., currently 10 years of age, and D.T., currently 7 years of age. During the marriage, Respondent, Lyndsey Turner, stayed home to care for the children, and Alex was the president of Corrosion Management Services (CMS). On February 9, 2021, Alex filed a petition for dissolution of marriage. Chuck Roberts was subsequently appointed as the guardian *ad litem* (GAL) for the minor children.

¶ 5        Dr. Roger Hatcher was appointed as the allocation evaluator pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2020)). Dr. Hatcher met with the parties several times and observed each party with the children. He conducted an investigation and interviewed several collateral witnesses. Dr. Hatcher also conducted psychological testing of the parties, including the Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-2), and the Millon Clinical Multiaxial Inventory, 3rd Edition (MCMI-III).

¶ 6        Dr. Hatcher's report provided in relevant part as follows. Dr. Hatcher noted that the MCMI-III showed Alex's openness in answering questions and disclosing his shortcomings but that he "describe[d] himself in overly positive terms to appear more morally correct for purposes of the evaluation." The findings showed that Alex had a tendency "to relate to others in [a] critical, arrogant fashion and portray himself as superior to those around him." This profile was consistent with people described as self-centered and controlling. Dr. Hatcher observed that these findings were consistent with his interviews and observations and stated that Alex met "the criteria for diagnosis of Narcissistic Personality Disorder." The MMPI-2 provided findings that were

consistent with the MCMI-III, including, *inter alia*, that individuals fitting Alex's profile are "overreactive to any perceived criticism and often childish and defiant in their responses." Dr. Hatcher concluded that the results "describe[d] an individual with strongly narcissistic personality traits \*\*\*."

¶ 7 Following psychological testing, Dr. Hatcher described Lyndsey as "normally adjusted."

¶ 8 Dr. Hatcher's report individually analyzed each factor relevant to the allocation of decision-making and parenting time. Given his conclusion that Alex had narcissistic personality disorder (NPD), Alex's controlling nature, the parties' difficulty in working together, and the fact that Lyndsey was historically the primary caretaker, Dr. Hatcher ultimately recommended that Lyndsey be awarded sole decision-making responsibility. As to parenting time, Dr. Hatcher found the health of the family to be the most significant factor, noting that Alex had "unusual personality traits and behaviors, namely [NPD], that impact his ability and willingness to work cooperatively, listen to the viewpoints of others and show empathy." Dr. Hatcher described these characteristics as a "cardinal deficit in any parenting plan." He also expressed doubt regarding Alex's ability to act in the children's interests over his own. He described Alex as "unusually self-centered" and "likely to affect the children as they grow, particularly by modeling his narcissistic traits and making decisions that transparently meet his needs rather than those of his children." Dr. Hatcher recommended that Lyndsey receive the majority of parenting time and Alex have parenting time every other weekend from Friday through Sunday, as well as a mid-week dinner visit. He also recommended that Alex have up to four weeks of parenting time in the summer.

¶ 9 Following the receipt of Dr. Hatcher's report, Alex filed a motion *in limine* to bar his evaluation, report, and testimony. Alex argued that Dr. Hatcher improperly diagnosed him with NPD. Alex continued that, because the diagnosis was the focal point of Dr. Hatcher's

3

recommendations for parenting time and decision-making, admission of the report into evidence would be prejudicial to Alex. The motion was denied.

¶ 10      Thereafter, Alex retained Dr. Robert Shapiro as an independent expert witness, and Dr. Shapiro sat for a discovery deposition on June 17, 2022, the transcripts of which were included as an exhibit at trial. Dr. Shapiro testified during his deposition that he interviewed Alex one time for two hours and that he had not had any contact with Alex since the meeting. Dr. Shapiro confirmed that he never met with Lyndsey or the children. Dr. Shapiro reviewed Dr. Hatcher's test results and report and opined that some of Dr. Hatcher's recommendations did not "fit with his data." Dr. Shapiro testified that he thought it was inappropriate for Dr. Hatcher to diagnose Alex with NPD, as it was not a forensic investigator's job to diagnose the participants of the allocation evaluations. Moreover, Dr. Shapiro explained that a diagnosis of NPD was an "overstretch of the data" because the MMPI-2 did not speak to NPD at all and the MCMI-III suggests only that he had narcissistic *traits* based on an elevated narcissism scale. Dr. Shapiro agreed, however, that Alex had narcissistic traits. Dr. Shapiro described these traits as arrogance and impatience when people do not respond well to him and explained that the treatment is long-term psychotherapy. Dr. Shapiro agreed that narcissistic traits are a red flag for joint decision-making. As to parenting time, Dr. Shapiro disagreed with Dr. Hatcher's recommended schedule, explaining that Alex was involved with the children, that they enjoyed each other, and that there was no reason to limit his parenting time. Dr. Shapiro suggested that Alex have alternating weekends from Thursday to Monday and that the Thursday in his off weeks should be an overnight.

¶ 11      Following Dr. Shapiro's deposition, Alex filed a three-count motion *in limine*. In count I, he again argued that Dr. Hatcher's report and testimony should be barred. In count II, Alex sought to bar Lyndsey from calling Dr. Shapiro as a witness, as she did not disclose him as an expert

witness in her Rule 213(f) witness disclosure. Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018). In count III, Alex contended that Dr. Shapiro's testimony should be limited to the topics delineated in Alex's Rule 213(f) witness disclosure, including his qualifications, his review of Dr. Hatcher's report and data relied upon in reaching his conclusion, the guidelines and procedures for allocation evaluations, the distinction between forensic evaluations and clinical evaluations, and the reason it is inappropriate for an allocation evaluator to diagnose a party. The motion was denied.

¶ 12    The court bifurcated the trial, and the trial regarding parental responsibilities commenced on July 25, 2022. N.T. was seven years of age at the time of trial, and D.T. was three years of age. At the time of trial, the parties had agreed that the children would attend a particular Catholic school in Wheaton (Wheaton school) through eighth grade.

¶ 13    The GAL testified first. He indicated that it did not "make an ounce of difference whether [Alex] [wa]s diagnosed with a narcissistic personality disorder or whether he merely suffers from narcissistic traits." He noted that, regardless of whether Alex had NPD or merely possessed the associated traits, both Dr. Hatcher and Dr. Shapiro observed that Alex's primary focus was himself. He explained that, at the time of trial, the children were on summer break, and the parties were exercising an equal, week-on-week-off schedule. The GAL testified that he had not observed Alex failing to meet the children's needs, as raised by Dr. Hatcher's report and that Alex was familiar with the tasks of parenting. He stated that Alex exhibited anger towards anyone who disagreed with him and that Alex did not appear to recognize his limitations or the concerns expressed by Dr. Hatcher.

¶ 14    The GAL recommended that Lyndsey be allocated sole decision-making responsibility. He further recommended that, during the school year, Lyndsey have the majority of parenting time, with Alex's parenting time being alternating weekends from Friday to Monday, a dinner every

Wednesday, and a dinner every Monday following Lyndsey's weekend. During the summer, the GAL recommended that the parties each have five weeks of uninterrupted parenting time, with no more than two consecutive weeks at a time.

¶ 15        Dr. Hatcher testified as to his investigation, findings, report, and recommendations. He stated that Alex had "an extraordinarily self-centered personality" and explained that NPD "is a deeply engrained behavioral patter that has been in operation for many years and so it's hard to unlearn these *** behavioral traits." He testified that psychotherapy, and sometimes medication to treat underlying emotional instability, were available treatments. Dr. Hatcher testified that his recommendations were based on Alex's behavioral patterns that were narcissistic in nature but that whether there was an agreement regarding the diagnosis of NPD was irrelevant because each professional involved in the case expressed concern about his controlling and self-centered behavior.

¶ 16        Dr. Shapiro testified regarding the difference between a clinical evaluation and an allocation evaluation. He also noted that, while Alex appeared to have many narcissistic traits, he also exhibited some behaviors that "fly in the face of that diagnosis." For example, Alex was aware that he rubbed people the wrong way and was able to identify his own weaknesses of impatience and spatial difficulties. He also noted that Alex was "more involved [with the children] than what *** is typical of somebody that's been diagnosed with an actual personality disorder." Dr. Shapiro stated that a diagnosis of NPD is prejudicial without an understanding of the diagnosis and how it translates into behavior, particularly given the "bad press" surrounding NPD. However, Dr. Shapiro testified on cross-examination that Alex did have narcissistic traits. Dr. Shapiro opined that Lyndsey should have sole decision-making responsibilities. Dr. Shapiro testified that, in his

6

opinion, an allocation evaluator could never diagnose a personality disorder because the evaluator does not have enough information to make a diagnosis.

¶ 17    Lyndsey testified, *inter alia*, that she agreed with the GAL's recommendations. Alex called three of his friends (who were also his employees) as witnesses. In sum, they testified that he is an engaged, patient, and empathetic parent.

¶ 18    Alex testified, *inter alia*, regarding his flexible work schedule. When asked why he wanted more parenting time with the children, he stated, "Well, *** naturally they provide me with tremendous joy for my life. *** But beyond that, I'm committed to making sure that every second that they are with me, I'm giving them the best opportunity to succeed and develop." Alex testified that he "handled basically all of the educational tasks related to [N.T.'s] development" before the divorce proceedings commenced.

¶ 19    On September 6, 2022, the court entered a parenting allocation plan and order (allocation judgment). At the time, Alex resided in Winfield, and Lyndsey resided in Warrenville. The court found that Alex had "many narcissistic traits." However, the court explicitly disregarded Dr. Hatcher's diagnosis of NPD as it relates to Alex, as well as his recommendations for parenting time and decision-making.

¶ 20    The court analyzed each factor relevant to the allocation of decision-making responsibilities pursuant to section 602.5(c) of the Act and awarded Lyndsey sole decision-making for education, healthcare, religion, and extracurricular activities. She was to make all significant decisions for the children after consulting Alex and considering his position. The court noted, *inter alia*, Alex's narcissistic traits and that the parties had "very significant difficulties" reaching agreements The allocation judgment provided that the children were to attend their Wheaton school from pre-school through eighth grade and that they were to be raised in the Catholic faith.

7

Moreover, each party was permitted to select one extracurricular activity per child per season, but the activity was to occur in Wheaton, Winfield, or Warrenville.

¶ 21    The court also analyzed each factor relevant to the allocation of parenting time pursuant to section 602.7(b) of the Act and awarded Lyndsey majority parenting time. The court again noted Alex's narcissistic traits and found it "[p]articularly striking" that, when asked why he would like more parenting time, Alex "began with what *he* gained from time with the children ***. This was a telling emphasis that the typed transcript alone does not fully capture." (Emphasis in original.) The court found that Alex "is interested first in what the children provide to him and secondarily with their needs." Lyndsey, on the other hand, was found to have the ability to place the children's needs above her own. During the school year, Alex was awarded parenting time on alternating weekends from Friday through Monday, every Wednesday until 9:00 p.m., and every Monday following Lyndsey's weekend until 9:00 p.m. The parent receiving the children was to be responsible for transportation, with the exception that Alex was to provide transportation to and from his Monday and Wednesday parenting time. During the summer, the parties were awarded equal parenting time that was to be divided into week-long blocks.

¶ 22    Alex appealed the allocation judgment, including the admission of Dr. Hatcher's diagnosis and recommendations and Dr. Shapiro's testimony recommending that Lyndsey be awarded sole decision-making. Alex further challenged the court's allocation of decision-making responsibility and parenting time. We affirmed. *In re Marriage of Turner*, 2023 IL App (3d) 220398-U. While the appeal was pending, the parties entered into a marital settlement agreement, and a judgment for dissolution of marriage incorporating the same was entered on March 14, 2023.

¶ 23    On May 29, 2024, Alex filed a two-count petition to modify the allocation judgment as it relates to both parenting time and decision-making. As to parenting time, Alex alleged that

Lyndsey "arbitrarily refused" Alex make-up parenting time and that the allocation judgment failed to provide for the good faith flexibility of both parties in the event a conflict with one parent's parenting time arose. Moreover, Alex stated that both parties had moved since entry of the allocation judgment. He was currently living in St. Charles, and Lyndsey was currently living in Wheaton. Alex alleged that, despite the terms of the allocation judgment, he had been solely responsible for the transportation to and from his parenting time. The children's differing school schedules (D.T.'s pickup was at 10:45 a.m. and N.T.'s was at 2:20 p.m.) also posed a "significant burden." Finally, Alex alleged that Lyndsey had become employed on a full-time basis and intended to have her parents provide childcare during the day while Alex was available, particularly during the summer. Alex requested a finding that there had been a substantial change in circumstances warranting a modification of parenting time to serve the best interests of the children. He sought additional parenting time, as well as the addition of a provision requiring good faith flexibility of the parties and make-up parenting time.

¶ 24    As to decision-making, Alex alleged that Lyndsey refused to transport N.T. to an after-school tutoring program in Winfield or agree to activities in St. Charles that would occur solely during Alex's parenting time due to the geographical limitation set forth in the allocation judgment. Furthermore, Alex alleged that Lyndsey had failed to provide appropriate educational support to the children and that, as a result, they were both falling behind. Specifically, following an assessment of D.T., numerous areas of "significant issues" were raised by the Wheaton school, and the school expressed concern about their ability to continuing supporting D.T. through kindergarten. To remain eligible, the administration recommended at-home learning support and provided the parties with resources. Alex alleged that Lyndsey blamed Alex for the children's struggles, withheld educational information from him, engaged in "disruptive 'finger pointing

9

matches' when attempting to communicate with school staff[,]" and excluded Alex from communications regarding N.T.'s individualized education program. Alex requested a finding that a substantial change in circumstances had occurred and an allocation of joint decision-making. Roberts was re-appointed as the GAL.

¶ 25    On July 18, 2024, Lyndsey filed a cross-petition to modify the allocation judgment. Lyndsey alleged that, following their respective moves, the distance between the parties' residences was approximately 15.5 miles. Lyndsey claimed that Alex had failed to exercise his scheduled parenting time on 30 occasions, which "disrupted" and "destabilized" the children's schedules. Lyndsey argued that this constituted a substantial change of circumstances warranting a reduction of Alex's parenting time.

¶ 26    On January 13, 2025, Lyndsey filed a petition for an evaluation pursuant to section 5/604.10(c) of the Act and noted that resolution of the motions to modify would "once again involve the issue of whether ALEX has Narcissistic Personality Disorder traits, that prevent ALEX from making significant decisions *** that are in the best interests of the Children." She requested the appointment of Dr. Mark Goldstein. The motion was denied.

¶ 27    Trial commenced on April 16, 2025. The GAL testified in a narrative format and introduced a January 30, 2025, letter from the Wheaton school's principal summarizing concerns with D.T. and N.T.'s academic progress. The letter indicated that D.T. struggled with letter recognition and sounds, sight words, phonics, numbers and counting, and handwriting. Her accommodations included small group instruction with a special education teacher for reading and math, one-on-one assistance, and modified assignments. Given the school's limited resources, the principal concluded that D.T. could not return to the Wheaton school the following year and encouraged the family to explore the support available in the public school system. N.T. continued

10

to struggle and reach grade-level proficiency in writing, reading, and math. A separate "significant area of concern" was N.T.'s organizational skills and follow-through with homework. Although the Wheaton school intended to closely monitor N.T.'s progress, he was invited to return the following year. Notwithstanding, the GAL testified that he interviewed the principal and that, given the children's struggles, the GAL and principal were "in agreement that both children would be well served by a transfer to the public school in Wheaton."

¶ 28    The GAL also introduced a presentation prepared by Alex, which included a plan for tutors, a desire for D.T. to have an evaluation completed through Cognitive Solutions, and photographs of Alex's residence and the developmental and educational materials available to the children during his parenting time. The GAL testified that he conducted a home visit and described Alex's residence as "magnificent" and noted that it was substantial in size, had an indoor in-ground swimming pool, and had "virtually every accommodation imaginable." At the time of trial, D.T. was scheduled for an independent evaluation at Cognitive Solutions to identify her educational needs. The GAL further testified that Alex wanted the children to transfer to St. Patrick's school in St. Charles; however, the GAL opined that the Wheaton school and St. Patrick's, both Catholic schools, had comparable resources and, as a result, St. Patrick's would be similarly unable to adequately support the children. As to the allegations of Alex's missed parenting time, the GAL indicated that Alex had offered some explanations, but that Alex did not dispute that he did, in fact, miss the time alleged.

¶ 29    The GAL stated that the current parenting schedule was not perfect but was "pretty close" and that decision-making should stay as-is. He opined that there had not been a substantial change in circumstances sufficient to warrant modification, noting that the primary change was the parties' change in addresses.

11

¶ 30    Alex's counsel examined the GAL and introduced written communication between the parties wherein Lyndsey stated, "I told [N.T.] that I love him and that if he wanted to try living with you, I was ok with it but I don't think it will work out long term. [D.T.] is too young to be without me during the school year. She needs the structure and consistency I can provide." The GAL found it problematic that Lyndsey had discussed the topic with N.T., as it should have been addressed between the parents. The GAL also agreed that, contrary to the terms of the allocation judgment, Lyndsey did not always consider Alex's input before making significant decisions for the children. The GAL confirmed that, in response to the children's academic struggles, Alex had purchased laptops for the children for both his and Lyndsey's homes and installed various educational programs thereon. The GAL was under the impression that Alex believed he could provide a better educational environment than Lyndsey. He also testified that Alex had narcissistic tendencies during the pre-dissolution proceedings and that he was "still in the same place[.]" He noted that Alex had been more approachable and cooperative with the GAL during the post-dissolution proceedings. He agreed that there had been "some level of improvement" in Alex's behavior and communication toward Lyndsey as well.

¶ 31    Upon examination by Lyndsey's counsel, the GAL confirmed that Lyndsey had communicated to him her educational plans for the children, the steps she had already taken, and her position on D.T.'s evaluation.

¶ 32    Alex testified next. He explained that he is able to work from home, make his own hours, and create his work schedule around his parenting time. He stated that the children are comfortable in and well-adjusted to his home and that they have a group of friends in the neighborhood. He explained that on his parenting time Sundays, he takes the children to church and uses old

12

classrooms in the church to tutor them afterwards. He acknowledged that he had missed some parenting time "due to real-life conflicts."

¶ 33    At this point, Alex's counsel attempted to introduce group exhibit seven, which included written communication between the parties "to rebut the alleged instances of missed parenting time" and "provide the context for those alleged missed parenting times." This exhibit had been previously admitted by stipulation of the parties. Following Alex's explanation of several instances, the court questioned the relevancy of the testimony since he could not be punished for missing parenting time. Alex's counsel responded that it was relevant because Lyndsey was using these instances as a basis to seek a reduction in Alex's parenting time, at which point Lyndsey's counsel indicated that Lyndsey would withdraw her petition to modify without prejudice. Still, Alex's counsel argued that these communications were relevant in that they showed that Lyndsey was unreasonable and refused Alex make-up parenting time. Despite the previous admission of group exhibit seven by stipulation, the court denied its admission *sua sponte*, explaining that it was irrelevant because the allocation judgment did not require make-up time.

¶ 34    Alex next testified that he had never been diagnosed with a personality disorder. Describing his improved demeanor since the pre-dissolution proceedings, Alex explained that he had gained more patience, kindness, and understanding of Lyndsey's feelings. He further explained that he primarily handled the children's education while the parties were married and that he was "well-attuned personality-wise to be a teacher." He expressed concern that the children, particularly D.T., had unlimited screen time at Lyndsey's house. He opined that D.T. was not receiving adequate attention and that it was manifesting in her behavior and performance in school. On cross-examination, Alex confirmed that he had not been treated for NPD or its associated traits.

13

¶ 35 Lyndsey testified next. She stated that, during the children's 2024 summer vacation, Alex did not take them to any of their scheduled summer camps or extracurricular activities. Since entry of the allocation judgment, N.T. had participated in chess club, choir, football, and baseball in Wheaton. Lyndsey recalled attending all his events, but Alex attended "[v]ery rarely." D.T. had participated in dance, cheerleading, and Girl Scouts in Wheaton. Lyndsey, again, recalled attending all D.T.'s events and that Alex attended "[e]xtremely rarely." To improve N.T.'s academic performance, Lyndsey testified that she hired a tutor, worked with N.T. nightly on homework, and encouraged good study habits. For D.T., Lyndsey hired a tutor, worked with her nightly on projects, and encouraged good study habits. Lyndsey testified that both children should attend public school because of the resources available to support the children. Lyndsey stated that, while she attended all of the children's medical and dental appointments, Alex had not attended any. Lyndsey maintained that joint decision-making was not possible for the parties, as she "ha[s] no voice with Alex. He disregards all my thoughts, opinions and, at times, even facts."

¶ 36 Lyndsey called Dr. Goldstein as an expert witness. Alex's counsel objected to his testimony, arguing that it was irrelevant because he was not appointed as a custody evaluator. The court overruled the objection as premature. Dr. Goldstein testified that he interviewed Lyndsey but had not interviewed Alex, the children, the GAL, or any other individuals. He had reviewed Dr. Hatcher's report, Dr. Hatcher's testing data, Dr. Hatcher's testimony, and Dr. Shapiro's testimony. He also reviewed the judgment for dissolution of marriage; the allocation judgment; several pleadings; the children's report cards and test scores; the January 2025 letter from the Wheaton school; N.T.'s past cognitive evaluation; and select communications between the parties, with the GAL, and from the school.

14

¶ 37    Lyndsey's counsel asked Dr. Goldstein whether he believed Alex had narcissistic personality traits, and Alex's counsel objected because Dr. Goldstein had not conducted any testing on the parties, he relied on outdated data, and the findings in the allocation judgment governed. The court overruled the objection, explaining that the objection went more to the weight that should be assigned to the evidence. Dr. Goldstein testified that he was of the opinion that Alex had narcissistic personality traits based on Dr. Hatcher's test data and testimony, Dr. Shapiro's testimony that Alex had narcissistic personality traits, that Alex was seeking to remove the children from their current home and community, and the findings set forth in the allocation judgment. He explained that treatment for narcissistic personality traits is long-term therapy once or twice a week but that there is no cure. Over Alex's counsel's objection, he opined that the children should not reside with Alex on a daily basis because they were functioning well in Lyndsey's home and community and that their academic struggles were cognitive in nature as opposed to being a result of Lyndsey's parenting skills. He also testified that, based on their academic performance, the children would be better served in a public-school setting. Acknowledging that he did not interview Alex, Dr. Goldstein testified that the written communications between the parties suggested that they have "real difficulty communicating" and would not do well with joint decision-making.

¶ 38    With respect to Alex's request to modify decision-making, the court found that the children's academic performance constituted a change in circumstances but that a modification of the allocation judgment was not required to address the problems. The court found that Lyndsey had taken the appropriate steps by contacting the school frequently and discussing the children's progress, and D.T. was scheduled to be evaluated to identify the cause of her struggles. The court found it reasonable to send the children to a public school and that, Lyndsey being the sole decision-maker and notwithstanding the provision regarding the Wheaton school in the allocation

15

judgment, Lyndsey was able to decide where to send the children to school. Citing Alex's testimony that he knows how to teach the kids better, the court observed that Alex seemed to ignore the school's recommendations. The court found that Lyndsey was better suited for sole decision-making because she is "more open-minded, willing to take in different views, and she's not just accepting it blindly."

¶ 39    With respect to Alex's request to modify parenting time, the court characterized Alex's petition as an attempt at a "do-over" of the pre-dissolution proceedings. The court stated that Alex did not seem to accept the (pre-dissolution) court's or Dr. Hatcher's findings that he has mental health concerns that need to be treated, as he made no effort to address them since entry of the allocation judgment. The court also noted that Alex's move to St. Charles and his request to change the location of the children's extracurriculars were self-serving and not for the benefit of the children because the children's friend base was not there.

¶ 40    The April 17, 2025, written order provided, *inter alia*, that Lyndsey's petition to modify parenting time was withdrawn without prejudice, and Alex's petition to modify the allocation judgment was denied for the reasons stated on the record. It further stated that "[b]ased on the provisions of the parties' Allocation Judgment and for the reasons stated in the record, [Lyndsey] has discretion to make decisions she feels are appropriate and necessary as it relates to the children's school enrollment." This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    Alex sets forth three central arguments on appeal. First, he argues that the court abused its discretion by excluding group exhibit seven and permitting Dr. Goldstein to testify. Second, he challenges the court's denial of his petition to modify the allocation judgment (parenting time and decision-making). Third, he specifically argues that the court's refusal to modify the geographical

16

limitation of the children's extracurricular activities was an abuse of discretion. For the reasons set forth below, we affirm.

¶ 43                    A. Evidentiary Rulings

¶ 44        Alex challenges the court's exclusion of group exhibit seven (various written communications between the parties) addressing the instances of Alex's missed parenting time that were alleged in Lyndsey's petition to modify (which was withdrawn without prejudice). He argues that its exclusion "deprived the court of a complete and accurate understanding of the circumstances surrounding the alleged missed parenting time which was central to the determination of the feasibility of increased parenting time and modification of the allocation judgment." He specifically contends that it shows that Lyndsey failed to facilitate Alex's relationship with the children, unilaterally made decisions without consulting Alex, and was inflexible by not allowing him make-up parenting time. He concludes that the information was "directly relevant to the statutory best interest factors" and that the exhibit was admitted by stipulation of the parties, thus making the court's *sua sponte* exclusion an abuse of discretion.

¶ 45        We briefly recount the court's treatment of group exhibit seven. Despite the parties' stipulation to its admission, the court excluded group exhibit seven on the grounds that it was irrelevant, explaining that the allocation judgment did not require Lyndsey to provide Alex with make-up parenting time or be flexible and thus her failure to do so was immaterial within the context of a modification proceeding. Alex's attorney subsequently requested to make an offer of proof as to certain portions of group exhibit seven, arguing that they directly refuted Lyndsey's attempt to "paint[] herself as the victim" and showed that Alex did not attend the children's extracurriculars due to Lyndsey's treatment of him. The court sustained Lyndsey's counsel's objection, noting that "from the [pre-dissolution] order it was obvious that they had difficulty

17

communicating. So it sounds like we're just going over old ground again, that they have difficulty communicating[.]"

¶ 46    Evidentiary rulings will not be disturbed absent a clear abuse of discretion, and reversal is only warranted where the ruling was substantially prejudicial and affected the outcome of the case. *Simmons v. Garces*, 198 Ill. 2d 541, 567-68 (2002).

¶ 47    Initially, we note that Alex does not provide any authority in support of his assertion that the parties' stipulation to the admission of group exhibit seven somehow removes or limits the court's discretion in making evidentiary rulings. As such, we reject this argument. See *Eckiss v. McVaigh*, 261 Ill. App. 3d 778, 786 (1994) ("Mere contentions without argument or citation of authority do not merit consideration on appeal[.]")

¶ 48    Turning to the merits, assuming for the sake of analysis that group exhibit seven was improperly excluded, there is no indication that this was substantially prejudicial or otherwise affected the outcome of the case. Initially, we disagree with Alex's argument that admission of the exhibit was necessary to provide the court with context for his missed parenting time, as there is no indication on the record that the court considered Alex's missed parenting time when making its ruling. In fact, the court noted during the hearing that Alex would *not* be punished for missing parenting time, particularly after Lyndsey withdrew her petition to modify.

¶ 49    We next address Alex's contention that group exhibit seven was critical to show the feasibility of his increased parenting time, Lyndsey's failure to facilitate his relationship with the children, Lyndsey's unilateral decision-making, Lyndsey's harassing behavior and inflexibility, Alex's ability to co-parent, and Alex's level of involvement in the children's lives. However, in considering whether Alex was prejudiced from the exhibit's refusal, we observe that the court heard other considerable evidence on these points.

18

¶ 50    For example, the GAL testified regarding Alex's home having "virtually every accommodation imaginable" for the children and dedicated learning areas for them. He also testified that Alex is involved with the children. The GAL further testified that it was problematic that Lyndsey had involved N.T. in a discussion regarding his living preferences. The GAL agreed that Lyndsey had refused Alex make-up parenting time and was, at times, inflexible when it came to the parenting schedule. He also testified that Lyndsey does not always consider Alex's input prior to making decisions for the children, contrary to the terms of the allocation judgment. He stated that Lyndsey could be "argumentative" and "abrasive," noting that Alex also had that capacity. The GAL testified that Alex's demeanor and temperament had improved since the pre-dissolution proceedings, both with the GAL and in his communications with Lyndsey. Alex testified that he had the flexibility to set his own work schedule, which was "dictated by [his] parenting time." Alex explained that he selected his home in St. Charles with the children in mind and that they were comfortable and well-adjusted to his home. He testified about the children's friends in his neighborhood, their participation in the church, and how he facilitates their education. Lyndsey testified regarding certain e-mails with a speech pathologist for N.T., acknowledging that Alex was not included in the communications. Accordingly, we conclude that group exhibit seven was merely cumulative in nature when considering the other evidence presented and thus its exclusion did not prejudice Alex or otherwise affect the outcome of the case. See *Zuelsdorf v. Montgomery Ward & Company, Inc.*, 64 Ill. App. 3d 408, 415 (1978) (exclusion of cumulative evidence was not prejudicial to plaintiff's case). Alex has not demonstrated how his case would have been furthered by introducing this evidence, and the court did not commit reversable error in excluding it.

19

¶ 51        Alex also challenges the admission of Dr. Goldstein's testimony, contending that his investigation was one-sided and his opinions were based on outdated data from the pre-dissolution proceeding. Alex argues that "Dr. Goldstein's testimony created a false appearance of clinical authority, where in reality, the testimony was conclusory, untested, and lacked even basic procedural integrity." Alex asserts that the court considered Dr. Goldstein's opinions, which "skew[ed] the court's analysis of the children's best interests."

¶ 52        Contrary to Alex's position, the court did not reference Dr. Goldstein's testimony or opinions in its ruling. Instead, the court noted the findings set forth in the allocation judgment regarding Alex's mental health and characterized Alex's petition to modify as "a do-over of Judge Skarin's [pre-dissolution] hearing." The court observed that Alex had not accepted the findings of Judge Skarin or Dr. Hatcher regarding his mental health and had taken no steps to address it; in making this observation, the court made no reference to Dr. Goldstein's findings. Thus, we need not determine whether Dr. Goldstein's testimony was improperly admitted because it did not discernably prejudice Alex. See *Simmons*, 198 Ill. 2d at 567-68.

¶ 53                        B. Modification of the Allocation Judgment

¶ 54        We next turn to the court's denial of Alex's motion to modify the allocation judgment. A court's factual findings will not be disturbed unless they are against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). "A decision is against the manifest weight of the evidence when an opposite conclusion is apparent or when the court's findings appear to be unreasonable, arbitrary, or not based on evidence." *In re Marriage of Verhines*, 2018 IL App (2d) 171034, ¶ 51. The trial court is in a superior position to weigh the evidence, assess the credibility of the witnesses, and determine the best interests of the children. *Bates*, 212 Ill. 2d at 515-16. Accordingly, a reviewing court will not reweigh evidence or assess witness credibility

20

to disturb a trial court's ruling merely because the evidence could have supported a different conclusion. *In re Marriage of Gorr*, 2024 IL App (3d) 230412, ¶ 46. A trial court's ultimate decision regarding modification is reviewed for an abuse of discretion. *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45.

¶ 55        Initially, we note that section 610.5(a) of the Act provides,

> "Unless by stipulation of the parties or except as provided in Section 603.10 of this Act, no motion to modify an order allocating parental decision-making responsibilities, not including parenting time, may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his or her mental, moral, or physical health or significantly impair the child's emotional development. Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2024).

This section serves as the "gateway to an evidentiary hearing on a modification [of decision-making] request if less than two years ha[ve] passed" since entry of the allocation judgment. *In re Marriage of Trapkus*, 2022 IL App (3d) 190631, ¶ 24 (citing *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 554-57 (1998)).

¶ 56        Here, the allocation judgment was entered on September 6, 2022, and Alex filed his motion to modify, which included a request to modify decision-making authority, on May 29, 2024, less than two years later. Accordingly, although the issue was not raised below or on appeal, the court would have been justified in denying Alex's request to modify decision-making on these grounds.

21

¶ 57 Notwithstanding, Alex's arguments with respect to both decision-making and parenting time fail on the merits. Pursuant to section 610.5(c) of the Act,

> "Except in cases concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a[n] *** allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing *** allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2024).

¶ 58 In determining the children's best interests with respect to decision-making, the court was required to consider all relevant factors, including (1) the wishes of the children; (2) the children's adjustment to their home, school, and community; (3) the mental and physical health of all parties; (4) the ability of the parents the cooperate to make decisions or the level of conflict between them; (5) each parent's past participation in past significant decision-making; (6) prior agreements or course of conduct between the parents; (7) the wishes of the parents; (8) the children's needs; (9) the distance between the parents' residences, transportation, schedules, and the ability of the parents to cooperate in making arrangements; (10) whether a restriction is appropriate; (11) the willingness and ability of each parent to facilitate a relationship between the children and the other parent; (12) physical violence towards the children; (13) abuse against the child or household member; (14) whether either parent is a sex offender; and (15) any other relevant factor. *Id.* § 5/602.5.

¶ 59 In determining the children's best interests with respect to parenting time, the court was required to consider all relevant factors, including (1) the wishes of the parents; (2) the wishes of

22

the children; (3) each parent's caretaking functions in the preceding 24 months; (4) prior agreements or course of conduct between the parents; (5) relationship between the children and their parents or siblings; (6) the children's adjustment to their home, school, and community; (7) the mental and physical health of all parties; (8) the children's needs; (9) the distance between the parents' residences, transportation, schedules, and the ability of the parents to cooperate in making arrangements; (10) whether a restriction is appropriate; (11) physical violence towards children or other household member; (12) ability of each parent to place children's needs above their own; (13) the willingness and ability of each parent to facilitate a relationship between the children and the other parent; (14) abuse against children or other household member; (15) whether either parent is a sex offender; (16) either parent's military family-care plan; and (17) any other relevant factor. *Id.* § 602.7.

¶ 60    Alex reasserts his argument that the children's academic decline constitutes a substantial change in circumstances warranting modification of both decision-making authority and parenting time. He contends that he has taken several meaningful steps to support the children academically, including finding an evaluator for D.T., purchasing laptops for the children, and tutoring the children. In contrast, he continues, Lyndsey merely maintained the status quo and offered "vague testimony that she helps with homework on a nightly basis." He emphasized that the children's performance declined while they resided with Lyndsey.

¶ 61    Though the court agreed that the children's academic performance constituted a change in circumstances, it concluded that no modification of the allocation judgment was necessary to address these concerns and specifically noted the appropriate steps Lyndsey had taken in the children's best interests. The court observed that Lyndsey was open-minded and willing to consider different views on what is best for the children, whereas Alex ignored the school's

23

recommendations and simply insisted that he could handle it better. The court also found that Alex had not accepted or taken any steps to address his mental health concerns raised during the pre-dissolution proceedings.

¶ 62    The record contains sufficient support for the court's conclusion that the children's academic struggles did not necessitate a modification of either decision-making authority or parenting time. The court was presented with evidence that fell squarely within the factors outlined in sections 602.5 (decision-making) and 602.7 (parenting time) of the Act, including but not limited to the children's needs and adjustment to their community, each parent's ability to put the children's needs first, and the mental health of the parties. The court also heard the ways in which Lyndsey was supporting the children academically, notwithstanding Alex's contention that his plan for the children was superior. We will not reweigh the evidence or reassess the parties' credibility simply because their testimony could have supported a different outcome. *Gorr*, 2024 IL App (3d) 230412, ¶ 46. We further note that the court's primary concern during the pre-dissolution proceedings, Alex's mental health, remains unaddressed, as confirmed by Alex's own testimony that he has not received any professional treatment for narcissistic traits. Indeed, during the modification proceedings, the court made observations that it found to be consistent with Alex possessing narcissistic traits.

¶ 63    Alex further argues that, because his move to St. Charles was in good faith, it supports a modification of the allocation judgment. He challenges the court's reliance on the self-imposed nature of this change in circumstances to deny modification. He maintains that his move was motivated by his employment and his desire to achieve more flexibility with the children with his reduced commute. He notes that the GAL described his home as "magnificent," there was no evidence that Alex's home was detrimental to the children, and that there was no evidence that the

children were negatively impacted by Alex's move. He also argues that the geographical limitation to the children's extra-curricular activities should be modified based upon his move to St. Charles.

¶ 64    However, these arguments fail to consider the applicable standard for modification, as it is not enough that Alex's new residence and community are not detrimental to the children. Even assuming for the sake of analysis that Alex's move did constitute a sufficient change of circumstances, Alex failed to demonstrate that modification of the allocation judgment is necessary to serve the best interests of the children. See *Rayburn v. Rayburn*, 45 Ill. App. 3d 712, 713-14 (1977) ("A change of circumstances of only the noncustodial parent may be considered, but it is not sufficient for a change of custody that the changed circumstances affect the parent's situation without affecting the welfare of the child."). The appearance of his home and closer proximity to his workplace do not show that modification of the allocation judgment is in the best interests of the *children*. We note that Alex set forth similar arguments regarding the renovations of his Winfield residence to accommodate the children during the pre-dissolution proceedings, and the court nevertheless found that it was in the children's best interests for Lyndsey to have the majority of parenting time. During the modification proceeding, the court heard that the children are involved in and well-adjusted to their community with Lyndsey, including but not limited to their extra-curricular activities and friend groups. As with the children's academic struggles, this evidence does not become immaterial merely because Alex also lives in a home and community suitable for the children. As noted above, the court found that the underlying concerns regarding Alex's mental health persist despite Alex's living situation. This conclusion is further supported by the understanding that an allocation judgment should not be "varied constantly, fluctuating with the health, employment or residence of the party not in custody." *Id.* at 713.

25

¶ 65       While Alex contends generally that the court failed to consider the factors set forth in section 602.7, he provided no support for his position apart from his recitation of the evidence presented during the modification proceedings that he believes supports his position. A trial court need not reference every statutory best interest factor or make explicit findings thereon "as long as evidence was presented from which the court could consider the factors prior to making its decision." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79 (1996); see also *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. We presume that the court knows and follows the applicable law. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43. Alex's argument essentially asks us to reweigh the evidence and reassess the witnesses' credibility, which we cannot do. *Gorr*, 2024 IL App (3d) 230412, ¶ 46. The record contains sufficient support for the court's conclusion that modification of decision-making and parenting time was not in the children's best interest. The court's factual findings were not against the manifest weight of the evidence, and the denial of Alex's petition was not an abuse of discretion. We affirm.

¶ 66                                    III. CONCLUSION

¶ 67       For the reasons stated herein, we affirm the judgment of the circuit court of Du Page County.

¶ 68       Affirmed.